A.A. POULTRY FARMS, INC., Boomsma Produce, Inc., Gressel Produce Co., Inc., Hemmelgarn & Sons, Inc., Mendelson Egg Company, Peter Produce, Inc., and Boomsma Produce of Missouri, Inc., Plaintiffs,

v.

ROSE ACRE FARMS, INC., Defendant.

No. IP 81–446–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 3, 1988.

Alfred C. Frawley, George Isaacson, Lewiston, Me., and Warren S. Radler, Ralph C. Hardesty, Chicago, Ill., and Lee B. McTurnan, Vicki L. Anderson, Wayne C. Turner, Hackman McClarnon & McTurnan, Indianapolis, Ind., for plaintiffs.

Robert P. Johnstone, Donald E. Knebel, David Hamilton, Mildred L. Calhoun, Mary Spalding Burns, Richard A. Cohen, Barnes & Thornburg, Theodore R. Boehm, Stephen H. Paul, Robert K. Stanley, Baker & Daniels, Indianapolis, Ind., for Rose Acre Farms, Inc.

## MEMORANDUM OPINION

NOLAND, District Judge.

The plaintiffs brought this anti-trust action against the defendant Rose Acre Farms, Inc. ("Rose Acre") alleging that Rose Acre violated Section 2(a) of the Clayton Act of 1914, as amended by the Robinson–Patman Act of 1936, 15 U.S.C. § 13 (1982) by engaging in illegal price discrimination or "predatory pricing." This cause was tried to a jury from October 5, 1987 through October 23, 1987. The jury returned a verdict in favor of the plaintiffs and assessed actual damages against Rose Acre in the amount of $9,285,634.00 which amount would be trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982).[1] Rose Acre has moved for judgment notwithstanding the verdict pursuant to Rule 50(b), Federal Rules of Civil Procedure and, in the alternative, a new trial pursuant to Rule 59, Federal Rules of Civil Procedure. The plaintiffs have moved for judgment on Rose Acre's counterclaim which counterclaim alleges that the plaintiffs' complaint is groundless and unfounded and the entire litigation, therefore, a

---

1. Section 4 of the Clayton Act provides in part:
 ... [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 15 U.S.C. § 15 (1982).

sham. By entry dated December 28, 1987 the Court set aside the jury verdict in favor of the plaintiffs and granted Rose Acre's motion for judgment notwithstanding the verdict and alternatively its motion for a new trial. This memorandum opinion is filed to accompany that entry and also to direct the entry of judgment in favor of the defendant Rose Acre. Because the Court has determined that the entry of judgment in favor of Rose Acre is appropriate and that alternatively a new trial is mandated, the Court must now also deny the plaintiffs' motion for judgment on the amended counterclaim.

## I. FACTUAL BACKGROUND

The plaintiffs who brought this action are all egg processors located in the midwestern United States who sell shell eggs to retailers, wholesalers and market facilitators in the midwest. The plaintiff A.A. Poultry Farms, Inc. (A.A. Poultry) is located in West Unity, Ohio and sells eggs to customers in New York and Pennsylvania among other places. The plaintiff Boomsma Produce, Inc. (Boomsma) is located in Pella, Iowa and sells eggs to customers in, among other places, Illinois and Indiana. The plaintiff Gressel Produce Co., Inc. (Gressel) is located in Delphos, Ohio and sells eggs to customers in Ohio and other places. The plaintiff Hemmelgarn & Sons, Inc. (Hemmelgarn) is located in Coldwater, Ohio and sells eggs, among other places, to customers located in New York, Ohio and Michigan. The plaintiff Mendelson Egg Company (Mendelson) is located in West Unity, Ohio and sells eggs in Michigan, among other places. The plaintiff Peter Produce, Inc. is located in Lime Springs, Iowa, and sells eggs in, among other places, Illinois, Indiana and Michigan. The plaintiff Boomsma Produce of Missouri, Inc. (Boomsma Missouri) has its principal place of business at Pella, Iowa and sells eggs in, among other places, Illinois and Missouri. The plaintiffs compete with the defendant Rose Acre and with each other to sell eggs to customers located in the states mentioned above and in other states.

Generally, an egg processor is a participant in the egg industry who prepares eggs for sale to retailers or wholesalers before their sale to the consumer. Processors purchase eggs directly from egg producers and then clean, carton, and grade the eggs. The egg producers from whom the processors purchase eggs are for the most part small independent farmers who raise live, egg-laying hens ("layers") and then sell the eggs to the processors. The plaintiffs in this action are all egg processors who purchase the eggs from producers and then resell them to wholesalers, retailers or market facilitators.[2]

The defendant Rose Acre is an integrated producer and processor of eggs. As an integrated producer and processor of eggs, Rose Acre maintains and raises its own layers to produce the eggs which it then processes at the same location and sells to wholesalers, retailers or market facilitators. The integrated producer and processor enjoys certain benefits of efficiency from producing and processing eggs at a single location which are not available to the plaintiffs who purchase eggs elsewhere for processing.

The prices obtained by an egg processor for its eggs from its customers is dependent on the supply and demand for eggs in his area. The eggs themselves come in different sizes (*i.e.*, pee wee, small, medium, large, ex-large and jumbo) and grades (*i.e.*, A or AA), with each combination of grade and size having an individual supply and demand. The layers themselves lay a combination of sizes of eggs and the producer cannot control what sizes of eggs are actually produced. Moreover, eggs are a

---

**2.** Market facilitators represent an alternative, ancillary market that provides an outlet for eggs that are not disposable along traditional selling lines. This group includes *egg breakers* which are egg product factories that actually use ("break") the egg to produce other goods; *egg clearing houses* which match suppliers and customers in other geographic markets; and *egg*

*exporters* who sell the eggs in the international market. Generally, egg breakers represent the least attractive alternative to the processors as their prices are customarily lower. As a result, producers do not normally sell their eggs to the breakers unless such producer possesses a surplus or excess supply which would otherwise be perishable.

perishable commodity. Because eggs have an indefinite shelf life, the age of the egg affects its price. Thus, processors may be forced to sell eggs at lesser prices or to "breakers" in order to sell them before they are too old or they expire. Each carton of eggs is stamped with a freshness or expiration date which ranges from two weeks to 30 days from the date the egg is laid.[3]

The actual pricing of eggs in the industry is done by formula pricing. Formula pricing is used in many agricultural industries where prices vary from one day to the next. The industry agrees on some type of formula which is expressed in terms of a certain price off some standard. The standard in the egg industry is the Urner Barry scale. Urner Barry sets a price for eggs for every day of the week. When egg processors contract to sell eggs they look first to the price set by the Urner Barry scale and contract to sell the eggs at a price "off" Urner Barry. Thus, for example, a processor might agree to sell eggs to a customer at 5 cents off Urner Barry for large eggs for a specific period of time. Until their agreement expires, the customer may purchase large eggs at 5 cents off the current Urner Barry price per dozen. This price is sometimes expressed in terms of "five back" meaning 5 cents off the Urner Barry price.

The allegations of price discrimination made by the plaintiffs center around the actual pricing practices of Rose Acre from July 1, 1977 through June 30, 1983, the relevant period for purposes of this action. Generally, the plaintiffs have alleged that Rose Acre targeted customers of the plaintiffs and sold eggs to them at special prices in order to induce them to purchase eggs from Rose Acre instead of the plaintiffs.

In 1978, Rose Acre borrowed 7 million dollars to build facilities for the production and processing of eggs. In 1979, Rose Acre borrowed an additional 6 million dollars for its expansion project. Between the period from 1978–1982, Rose Acre in-creased its production capacity from less than 1.5 million layers to 3.4 million layers, an increase of about 127 percent. Rose Acre's gross revenues increased from 15.6 million dollars to 42.5 million dollars. During the same period, egg production and consumption nationally increased by about 3.8 percent. Rose Acre's expansion and increase in production capabilities resulted in substantially more eggs for Rose Acre to market and sell.

During the relevant period, five of the seven plaintiffs also experienced increased sales. Boomsma experienced increased sales of 20,891,000 dollars in 1977 to 27,-632,000 dollars in 1983. Boomsma Missouri experienced increased sales from 5,272,000 dollars in 1978 to 9,766,000 dollars in 1983. Hemmelgarn experienced increased sales from 12,723,000 dollars in 1977 to 30,053,000 dollars in 1983. Mendelson experienced increased sales from 4,804,000 dollars in 1977 to 6,145,000 dollars in 1983. Peter Produce had only a small increase from 2,915,000 dollars in sales in 1977 to 2,949,000 dollars in sales in 1983; however, Peter Produce did have increased sales of 3,361,000 dollars in sales in 1981 and 3,197,000 dollars in 1982. A.A. Poultry went from 6,222,000 dollars in 1977 to a low of 4,762,000 dollars in sales in 1983. Gressel had 13,117,000 dollars in sales in 1977 and went to a sales high of 14,701,000 dollars in 1981 before declining to 11,251,000 dollars in sales in 1983.

The evidence showed that during this period of time, Rose Acre made sales of eggs to various customers at lower or "special" prices. Rose Acre's agreements with customers for the sale of eggs often included a specific number of these specials during the period of the agreement. The specials comprised a major portion of all of Rose Acre's sales during the relevant period of this action. In fact, the so-called "specials" may have been considered the norm. Rose Acre's weekly sales summaries introduced by the plaintiffs at trial showed that Rose Acre did offer special

---

**3.** Marcus Rust testified that Marsh Supermarkets requests a freshness or expiration date of two weeks from the date the egg is laid. Gener-ally, the freshness date is 30 days from the date the egg is laid.

prices on certain eggs to various customers during the relevant period of this action.[4] Additionally, the plaintiffs testified that customers who stopped purchasing eggs from them told them that they were purchasing eggs from Rose Acre in order to get a lower price. The plaintiffs allege that these specials were sold at prices below Rose Acre's cost to produce and process the eggs and as a result of Rose Acre's below cost pricing competition in the shell egg market was harmed.

## II. ANALYSIS

### A. *Judgment Notwithstanding the Verdict*

■ The standard to be employed by this Court in analyzing a motion for judgment notwithstanding the verdict is whether there is substantial evidence to support the verdict. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1410 (7th Cir.1984). The Court may neither judge the credibility of witnesses nor reweigh the evidence in order to find a preponderance for one side or the other. *Id., citing Freeman v. Franzen*, 695 F.2d 485, 489 (7th Cir.1982), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). The only proper inquiry to be made by the Court is whether the evidence presented at trial, viewed in a light most favorable to the party winning the verdict, is sufficient to support the verdict. *Syvock v. Milwaukee Boiler Manufacturing Co.*, 665 F.2d 149, 153 (7th Cir.1981). The evidence must be substantial. "A mere scintilla of evidence will not suffice." *La Montagne*, 750 F.2d at 1410, *citing Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969).

■ The plaintiffs have brought this action alleging that Rose Acre has engaged in price discrimination at the primary or seller level. Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a) prohibits certain pricing practices which lessen competition. Section 2(a) provides in pertinent part that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

"Price discrimination" in Section 2(a) means a price difference. *F.T.C. v. Anheuser–Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). Thus, a different price charged to different buyers for the same product is price discrimination within the meaning of Section 2(a). *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 346 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). However, price discrimination in and of itself is not illegal *per se*. Rather, "[a]t the primary level, the plaintiff must show that the 'effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce....'" *O. Hommel Co.*, 659 F.2d at 340, *citing Anheuser–Busch*, 363 U.S. at 542–43, 553, 80 S.Ct. at 1270–1271, 1276; 4 *Von Kalinowski, Anti-trust Laws and Trade Regulation* §§ 28.08, 29–01[4] (1980); *Utah Pie Co. v. Continental Bak-*

---

**4.** The weekly sales summaries of Rose Acre are but a part of the voluminous documentary evidence produced at trial. Because the Court has determined that the difference in prices charged by Rose Acre to some customers did not cause a competitive injury, *see infra* at pp. 686–92, the Court will not include a review of each of the documents presented at trial nor review the sales made at special prices to affected customers. The Robinson–Patman Act is concerned with the *effects*, if any, of the specials on competition. A specific recounting of each alleged discriminatory sale will not aid the Court in determining the effects of any pricing differences on the market. The Court infers from the documentary evidence and the testimony of the plaintiffs that Rose Acre made many sales at special prices and will analyze only the effects of these sales on the market.

*ing Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); *Dean Milk Co. v. F.T.C.,* 395 F.2d 696, 700 (7th Cir.1968) (footnote omitted).

■ In order to find liability for illegal price discrimination under Section 2(a), the plaintiffs in the present action must show that a competitive injury resulted from any differences in price. The plaintiffs may establish competitive injury by either showing: "1) actual competitive injury shown by market analysis; [or] 2) predatory intent from which competitive injury may be inferred." *O. Hommel Co.,* 659 F.2d at 347 (1981).

■ The evidence in this case showed that during the relevant period Rose Acre sold shell eggs to various retailers and wholesalers at "special prices." Rose Acre did not offer the same quantity of specials to each of its customers, nor did it sell all of its specials to the various customers at the same price. Assuming that the selling of such specials to some customers and not to others constitutes price discrimination, the question which must be resolved is whether the effect of the price differences was "substantially to lessen competition or [to] tend to create a monopoly...."

The evidence presented at the trial of this cause is not sufficient to find actual competitive injury in the egg market. Rose Acre expanded its operation and facilities during the relevant period which resulted in an increase in its production capacity from about 1.5 million layers to 3.4 million layers, an increase of about 127%. Additionally, Rose Acre's gross revenues increased from 15.6 million dollars to 42.5 million dollars. However, during this period of time, the plaintiffs grew and also increased their number of layers and gross revenues. As a group, the plaintiffs themselves had increased gross revenues from 60 million dollars in 1977 to over 92 million dollars in 1983.[5] The evidence also showed that the plaintiff Hemmelgarn grew almost

as fast as Rose Acre did during the relevant period, increasing its eggs sales from about 13 million dollars to over 30 million dollars in 1983. Experts for both parties testified that according to industry publications, 34 new egg companies entered the market during the period from 1977–1983. While some of these companies were not successful, the average growth of these new entrants was approximately 220% during the relevant time. Companies located in the areas in which Rose Acre sold its eggs which entered the market or expanded significantly include Wabash Valley Produce which grew from 2 million to 3.3 million layers; Midwest Poultry Services which grew from under 1 million to 2.25 million layers by 1983; Croton Egg Farm entered the market and grew to 2.8 million layers by 1983; Daylay Egg Farm also entered the market and grew to 1.2 million layers by 1983. Additionally, Creighton Brothers and Weaver Brothers, both located in Indiana, expanded operations and grew during this period of time.

■ Even the most favorable viewing of the evidence in favor of the plaintiffs indicates a healthy, competitive market, marked by the growth of the plaintiffs and the entry and growth of other egg processors in the area. The contention that Rose Acre's expansion and growth harmed competition during this period is untenable. The evidence is insufficient to support any such contention.

■ Nor was there any evidence of the trend toward monopolization of the market by Rose Acre. Dr. John Umbeck, expert witness for the defendant, testified that at the beginning of the relevant period, Rose Acre produced about 4% of all eggs in the four state area of Ohio, Indiana, Illinois and Michigan where Rose Acre sold most of its eggs. By the end of the relevant period Rose Acre's share had only increased to 8%. Dr. Umbeck calculated

**5.** At trial the plaintiffs objected to the grouping of them together to illustrate that they, *as a group,* had increased revenues or egg sales. Because the Robinson–Patman Act is concerned with the detrimental effects on competition rather than on individual competitors, it is ap-

propriate in this case to look at the total sales of all the plaintiffs in combination to demonstrate that growth within the industry and among Rose Acre's competitors was occurring during the period it was alleged that Rose Acre had engaged in predatory pricing.

Rose Acres' share of egg production nationally to be about 1% during the middle of the relevant period.

Never in the short run or long run did Rose Acre ever dominate the egg market. Nor was there a time when Rose Acre could increase its prices to benefit from alleged predatory pricing. Rose Acre made a profit every year except one during the years in question which belies the charge of selling eggs before cost.

The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966) *quoting U.S. v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). "The existence of such power ordinarily may be inferred from the predominant share of the market." *Id.* Rose Acre's actual share of the market during this period in no way reflected monopoly power. *See American Tobacco Co. v. U.S.*, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (two-thirds of domestic field of cigarettes, and 80% of field of comparable cigarettes constituted a substantial monopoly); *Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698 (87% of central station business is monopoly power). An 8% share of the shell egg market is simply insufficient to establish that Rose Acre had the power to exclude competition or to control prices of shell eggs either in the midwest or nationally. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed. 427, 441 n. 15 (1986) (21% market share suggests lack of sufficient market power to engage in predatory pricing); *D.E. Rogers Associates, Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1434 (6th Cir.1983), *cert. denied*, 467 U.S. 1242, 104·S.Ct. 3513, 82 L.Ed.2d 822 (1984). (10% to 15% share of the market not sufficient to create possibility of injury to competition). Given the economic realities of the egg industry, particularly the ½ cent to 1 cent per dozen eggs profit margin available to processors, it would have been impossible for Rose Acre to effectively control prices in the market. Had Rose Acre attempted to raise its prices at any time during that period to effectively use its "monopoly power," any number of processors would have sold under the inflated price to sell eggs in line with the market. The evidence is insufficient to show a trend toward monopolization of the industry by Rose Acre.

Even though there is insufficient evidence from which actual competitive harm could be found, liability under the Robinson–Patman Act may be imposed if there is sufficient evidence of Rose Acre's predatory intent from which competitive harm may then be inferred. *MCI Communications v. AT & T Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Rose Acre's predatory intent may be proven by showing either express evidence of predatory intent or the inference of predatory intent by showing pricing below cost. *O. Hommel*, 659 F.2d at 347.

The plaintiffs introduced the testimony of Phil Gressel, owner of the plaintiff Gressel Produce Co., Inc., to try to establish direct evidence of Rose Acre's predatory intent. Mr. Gressel testified that on one occasion during the relevant period, Marcus Rust made an unusual casual visit to Gressel Produce Co., Inc. During a conversation with Mr. Gressel, Marcus Rust told him that Rose Acre would run him out of business. Other express evidence of predatory intent introduced at trial included proposal letters sent by Rose Acre to various customers outlining terms for the sale of eggs. Many of these proposal letters included terms for a number of "specials" available to the customers. While the comment made by Marcus Rust to Phil Gressel may be some evidence that Rose Acre intended to compete aggressively with Gressel, and perhaps win business from his customers, it does not constitute substantial evidence that Rose Acre desired to or intended to monopolize the entire shell egg market. The very nature of healthy competition is marked by businesses which are unable or unwilling to compete losing business and perhaps even going out of business. *See Ball Memorial Hospital, Inc. v. Mutual Hospital Insur-*

*ance, Inc.,* 784 F.2d 1325, 1338–39 (7th Cir.1986); *Janich Brothers, Inc. v. American Distilling Co.,* 570 F.2d 848, 855 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978) (vigorous competition resulting in efficient firms driving less efficient firms out of business not proscribed by the anti-trust laws). It is when illegal practices are employed to drive others out of business that competition becomes unhealthy to the point that the anti-trust laws will impose liability. Even when Marcus Rust's comment is properly considered with the evidence that Rose Acre offered specials to various customers, it is not sufficient to establish predatory intent. Evidence introduced at trial indicates that the offering of specials to customers is common in the egg industry. The mere fact that such specials were offered does not establish predatory intent.

Predatory intent may be inferred by showing that Rose Acre priced below its cost. The plaintiffs have alleged that Rose Acre priced eggs which it produced as a result of its extensive 1977 expansion project below its costs of producing those eggs. In its November 17, 1986 Order denying summary judgment, this Court took a position favoring the long-run incremental cost ("LRIC") standard as set forth by the Seventh Circuit Court of Appeals in *AT & T,* 708 F.2d 1081 as the proper standard to determine whether Rose Acre engaged in below cost pricing, which would then allow an inference of anti-competitive intent. *See AT & T,* 708 F.2d at 1111; *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 701, 87 S.Ct. 1326, 1335, 18 L.Ed.2d 406 (1967).[6]

In accepting the LRIC cost standard, the Seventh Circuit noted that the measure of incremental costs in a predatory pricing case was a representation of the average cost to the defendant of adding "an entire new service or product rather than merely the last unit of production." *AT & T,* 708 F.2d at 1115. Long-run incremental cost measures all of the costs of adding the new service or product including fixed and variable costs. *Id.* The use of long-run incremental cost rather than of fully distributed costs as a standard measures only the costs "which are causally related to the service or product in question." *AT & T,* 708 F.2d at 1122. Furthermore, "[t]he use of long-run cost analysis may be particularly appropriate to capital-intensive processes where growth of plant and equipment is marked." *AT & T,* 708 F.2d at 1115.

The long-run incremental cost standard was used in the present action to determine whether the defendant engaged in predatory pricing. The plaintiffs alleged in their complaint and have argued throughout this action that Rose Acre underwent an extensive expansion during 1977–1983 which resulted in the growth of Rose Acre at the rate of more than 200% during the relevant period. The plaintiffs argue that this expansion resulted in the creation of millions of surplus eggs which were disposed of by Rose Acre by a marketing strategy which included selling a large number of specials to the plaintiffs' customers. It is these specials which the plaintiffs contend were sold below Rose Acre's costs to constitute predatory pricing practices. Because the plaintiffs have pursued this case attacking the allegedly intentionally created surplus of eggs produced during Rose Acre's expansion to be sold as specials, the long-run incremental cost standard was applied at trial to determine whether Rose Acre sold those specials at a price which was below its costs.

In its November 17, 1986 order resolving outstanding motions, this Court accepted the following definition of long-run incremental cost: "'total company cost minus what total cost of the company would be in absence of product of x, all divided by the

---

**6.** The defendant Rose Acre has argued extensively that the more appropriate or correct cost standard to be applied to this case is one which measures "average variable costs." Because the plaintiffs have based their claims for relief on the harm caused them by the additional or surplus eggs created by Rose Acre's expansion, the plaintiffs have argued that long-run incremental cost is the correct standard. The average variable cost standard is discussed *infra* at pp. 696–97 in connection with the Court's alternative conditional grant of Rose Acre's motion for a new trial.

quantity of x being produced.' Baumal, *Quasi–Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1, 9 n. 26 (1979)." *AT & T,* 708 F.2d at 1115 n. 45.

 The granting of the judgment notwithstanding the verdict is warranted because the plaintiffs failed to produce sufficient evidence to support a finding that Rose Acre priced below cost. The plaintiffs used two expert witnesses in an attempt to prove that Rose Acre's pricing of its specials to customers during the relevant period was below its long-run incremental costs. The data and analysis used by these experts is inadequate to establish that Rose Acre's pricing practices were below its costs under the appropriate cost standard.

Dr. Willard Mueller, economist, testified as an expert for the plaintiffs as to his analysis of Rose Acre's costs and pricing practices during the relevant period. Dr. Mueller testified that he had used three separate methodologies to calculate the value of Rose Acre's specials to the affected customers. Dr. Mueller testified that he then made comparisons between the values of the specials under each methodology and Rose Acre's long-run incremental costs and determined that under each methodology, Rose Acre's specials for the relevant period were, except in a very few instances, below its long-run incremental costs. Dr. Mueller's opinion that Rose Acre's specials were below its long-run incremental cost however suffers from one major flaw. Throughout his discussion of the cost methodologies, he referred to Rose Acre's long-run incremental cost as calculated by the certified public accountant.[7] Dr. Mueller never made any calculation as to Rose Acre's long-run incremental cost, but relied on the long-run incremental cost figure which he testified was calculated by the certified public accountant. While such reliance is not in itself fatal, the fact that the certified public accountant later testified that he was not able to calculate Rose

Acre's long-run incremental cost because he did not have sufficient data to make such a calculation renders Dr. Mueller's opinion as to Rose Acre's pricing practices speculative and unreliable. Mr. Richard Hoeh, the expert certified public accountant testifying on behalf of the plaintiffs, explained under cross-examination the calculations he made:

> Mr. Johnstone: Is it correct that what you have calculated is an amount for modified total expense per dozen of eggs by your calculation for Rose Acre for the years 1976 through the year 1983?

> Mr. Hoeh: Yes, sir, that's correct.

> Mr. Johnstone: And is it correct that the figures for those respective years in the line which says "modified total expense" is a number which would apply to every egg produced by Rose Acre in that year?

> Mr. Hoeh: Yes, it is the average of all of the production.

> Mr. Johnstone: *And is it correct, then, that the figure under "modified total expense" does not apply just to the eggs from any expansion by Rose Acre in any given year?*

> Mr. Hoeh: *Yes. Again, it is the total production for the particular year.*

> Mr. Johnstone: Did you, in doing your work for Exhibit 54, make any calculation on the cost of producing the incremental eggs in any year?

> Mr. Hoeh: This computation was an attempt to measure the total cost, but—

> Mr. Johnstone: Go ahead.

> Mr. Hoeh: But because I had no information available as to specific facilities, that I was not able to do.

> Mr. Johnstone: I believe we are saying the same thing.

> Mr. Hoeh: I think we are.

> Mr. Johnstone: *Is it correct, then, that you did not make any calculation of the cost of just the cost of producing*

**7.** Dr. Mueller never specifically named the certified public accountant who did the calculations upon which he relied. The most logical inference favoring the plaintiffs is that the certified public accountant to whom Dr. Mueller referred is Mr. Richard Hoeh who testified after Dr. Mueller as to various calculations which he made.

*the incremental eggs which resulted from Rose Acre's expansion?*

Mr. Hoeh: *That's correct I was not able to do that.*

Mr. Johnstone: Were you asked to do that?

Mr. Hoeh: That's what this is an attempt to do, to the extent that the information was available.

Hoeh, Cross at pp. 73–74 (October 16, 1987) (emphasis added). Mr. Hoeh's testimony that he did not calculate the cost of just the incremental eggs resulting from Rose Acre's expansion renders Dr. Mueller's opinions which are based on the long-run incremental cost completely useless. Under Mr. Hoeh's calculations, the "modified total expenses" equals the average of *all production* at Rose Acre by year during the relevant years and not the incremental costs of producing the surplus eggs.

Exhibit 54[8] prepared by Mr. Hoeh to illustrate his cost calculations does not contain any information from which a jury could infer what Rose Acre's long-run incremental cost for the relevant years had been. Mr. Hoeh's calculations, testimony and Exhibit 54 are the only evidence produced at trial to show Rose Acre's costs. Even the most favorable treatment of this evidence for the plaintiffs does not provide any inkling as to what Rose Acre's long-run incremental costs as defined by the Seventh Circuit and this Court actually were during the period relevant to this action. The conflicting testimony of Dr. Mueller that he relied on a long-run incremental cost figure calculated by the certified public accountant and Mr. Hoeh's testimony that he was unable to calculate such a figure leaves a void in the plaintiffs' case. The jury could not properly infer from this evidence that Rose Acre sold eggs below its long-run incremental costs.

The Court would here point out that further consideration leads this Court to believe that the correct terminology should have been average variable cost or short-run marginal cost rather than long-run incremental cost. The Court's definition and meaning, however, is still the same as con-

tained in Jury Instruction No. 21 which pointed out that Rose Acre's pricing should cover "the *additional* total company cost resulting from the *additional* equipment and facilities used to increase egg production divided by the increased quantity of eggs being produced." The results of this change in terminology is discussed *infra* at pp. 696–97.

■■■ Because the evidence presented at trial is insufficient to establish that a competitive injury resulted from any difference in price charged by Rose Acre, the verdict for the plaintiffs cannot stand. Injury to competition is an essential element of a Robinson–Patman Act claim. Without proof of such injury, judgment for the defendant Rose Acre is appropriate. The Court will therefore vacate the jury verdict and enter judgment for Rose Acre.

■■ The granting of the defendant's motion for judgment notwithstanding the verdict is also warranted under the "perishability defense" contained in the Robinson–Patman Act, which excludes from liability sales made in response to changing market conditions. The Fourth Proviso of Section 2(a) of the Act states:

> And provided further, that nothing herein contained shall prevent price changes from time to time where *in response to changing conditions affecting the market or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods,* obsolescence of seasonable goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods conceived.

15 U.S.C. § 13(a) (emphasis added).

Rose Acre contends that its sales of eggs at special prices were made in response to changing market conditions and to prevent the deterioration of perishable goods. The evidence presented at trial established that eggs are a perishable commodity which have a short shelf life. The freshness dates stamped on each carton of eggs allows up to 30 days from the date the egg is

---

**8.** Plaintiffs' Exhibit 54 is reproduced in full in the appendix attached hereto.

laid until it "expires" or is no longer fresh. During this short period of time the egg processor must clean, grade and package the egg before distributing it to wholesalers or retailers for sale to the consumer. The age of the egg affects its marketability and the price which the customer will be willing to pay. Egg production cannot be regulated by the farmer in response to daily fluctuations of demand for a specific size or grade of egg. Layers lay a combination of sizes of eggs and the producers or processors must work with the eggs actually produced. These factors bring the sales made by Rose Acre during the relevant period within the Fourth Proviso of the Robinson–Patman Act.

Rose Acre's sales of eggs to retailers and wholesalers at special prices during the relevant period rather than to market facilitators are protected by the Fourth Proviso of the Robinson–Patman Act. The eggs produced by Rose Acre had to be distributed under the compulsion of perishability. The mere fact that Rose Acre, contrary to the choices of its competitors, chose one market over another does not render its actions predatory.

### Rule 54(b) Certification

This action involves a counterclaim filed by the defendant Rose Acre against the plaintiffs which was bifurcated from the complaint for trial by order of this Court upon motion of the plaintiffs. The issues raised by the counterclaim have not yet been tried and are still pending before this Court. The retention of the counterclaim raises questions regarding the finality and appealability of any judgment entered in favor of the defendant on the plaintiffs' complaint.

■■■■■ Rule 54(b), Federal Rules of Civil Procedure allows "the court to direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." The purpose of Rule 54(b) is to prevent piecemeal litigation and to assure that the courts of appeals will not be sub-

ject to successive appeals which require the consideration of the same issues. *Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698, 702 (7th Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); *O.D.C. Communications Corp. v. Wenruth Investments,* 826 F.2d 509, 513 (7th Cir.1987). A certification pursuant to Rule 54(b) requires that the certified claim be separate from the remaining claim, the judgment entered on the certified claim be final under 28 U.S.C. § 1291 and that district court expressly determine that there is "no just reason for delay." *Wenruth Investments,* 826 F.2d at 512 (citations omitted).

■■■■ The certified claim and the remaining counterclaim in this action are separate within Rule 54(b). The counterclaim alleges that plaintiffs conspired with each other to force Rose Acre to abandon its competitive conduct and that when Rose Acre refused to join in the conspiracy, the plaintiffs filed their complaint to harass Rose Acre. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Premier Electrical Construction Co. v. National Electrical Contractors Association, Inc.,* 814 F.2d 358 (7th Cir. 1987). Resolution of the defendant's counterclaim involves a different set of factual circumstances not considered by the Court in trying the plaintiffs' complaint. While the parties to the claims are the same, there is no significant overlapping of facts necessary to the resolution of their claims. The district court will not have to reconsider the facts concerning Rose Acre's pricing practices during the relevant period nor the effects of Rose Acre's conduct on competition. Rather, the counterclaim will raise facts concerning the plaintiffs' conduct and its harm on Rose Acre—facts not considered in resolving the plaintiffs' complaint. Moreover, the relief sought by the complaint and the counterclaim are entirely separate. Recovery on the complaint does not preclude recovery on the counterclaim. The certified claim and the counterclaim do not overlap, factually or legally, and certification under Rule 54(b) is proper.

It is particularly appropriate that the Court of Appeals consider the issues raised by the certified claim at this time. This action has been pending since 1981 and consequently has involved a great deal of time and effort by the parties, their counsel and the Court. After consideration of the certified claim on appeal, should the Court of Appeals affirm the granting of the judgment notwithstanding the verdict and determine that the plaintiffs failed to prove an anti-trust injury, that matter would be concluded. Then all that would remain would be resolution of the counterclaim. It would be unproductive for this Court to consider at this time a counterclaim which raises different factual and legal issues prior to allowing an appeal from the entry of judgment in favor of Rose Acre on the issues raised in the complaint. Moreover, in the event that the Court of Appeals disagrees with this Court on the entry of judgment notwithstanding the verdict, the entire matter would be retried by the Court pursuant to the conditional grant of a new trial. Because the Court instructed the jury that the long-run incremental cost standard was the correct measure of costs to determine whether Rose Acre priced below cost, it would be beneficial to receive guidance from the Court of Appeals as to the correct cost standard prior to any retrial.

As the certified claim raises issues separate from the counterclaim, there is no just reason for delay in the entry of final judgment on the certified claim. Immediate entry of judgment will allow an expedient review of the Court's decision and avoid further delay in the final resolution of this matter. The Court, therefore, directs the entry of judgment in favor of the defendant on the plaintiffs' complaint. Thus, based upon the foregoing discussion, it is the opinion of this Court that the judgment in favor of the defendant is ripe for appeal. The counterclaim will be considered separately as necessary.

### B. *Motion For A New Trial*

The Court has determined that the evidence introduced at trial does not support the verdict and that judgment for the defendant is appropriate. Should the Court of Appeals determine that the grant of the defendant's motion for judgment notwithstanding the verdict and the entry of judgment in favor of Rose Acre were in error, this Court finds that the grant of the defendant's motion for a new trial is necessary. The grant of the new trial is conditional and will become effective only in the event that the grant of judgment notwithstanding the verdict is reversed. *See* 9 *Wright & Miller, Federal Practice and Procedure* § 2540 (1971).

The authority to grant a motion for a new trial pursuant to Rule 59, Federal Rules of Civil Procedure is within the discretion of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980). In determining whether to grant a motion for a new trial, unlike considering a motion for judgment notwithstanding the verdict, "the judge may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires." *Spanish Action Committee of Chicago v. City of Chicago,* 766 F.2d 315, 321 (7th Cir.1985) *citing Garrison v. United States,* 62 F.2d 41, 42 (4th Cir.1932); 9 *Wright & Miller, Federal Practice and Procedure* § 2531 (1971).

A review of all of the evidence indicates that the verdict rendered by the jury is against the clear weight of the evidence and is grossly excessive and must therefore be set aside and a new trial granted. Additionally, because the Court finds that it was in error as to certain legal determinations it made during the course of the trial, a new trial is necessary to prevent a miscarriage of justice.

#### 1. Robinson–Patman Liability

 This Court has determined that there is insufficient evidence in the record to support a finding of liability under the Robinson–Patman Act because the plaintiffs failed to demonstrate a competitive harm or anti-trust injury compensable by the anti-trust laws. The Court has reviewed the evidence fully above at pp. 686–92, and will not undertake an extensive reanalysis of such evidence in considering

the motion for a new trial. The standard to be applied in considering the motion for the new trial is more lenient than that in considering a judgment notwithstanding the verdict—if the Court finds that the verdict is against the weight of the evidence, the grant of a new trial is appropriate. The specious nature of Dr. Mueller's opinions as to competitive harm and the lack of any facts to support these opinions mandates that the verdict be set aside. The evidence established the existence of a healthy, competitive market marked by the growth of the plaintiffs and the entry of new companies into the industry during the period of alleged predation. The plaintiffs' belief that they would have been able to grow more during the relevant period does not give rise to Robinson–Patman liability. Dr. Mueller's reliance on Mr. Hoeh's calculation of "modified total expenses" as a measure of Rose Acre's long-run incremental costs despite Mr. Hoeh's testimony that the "modified total expenses" is a calculation of costs for all of Rose Acre's production and *not* the cost of producing the incremental surplus eggs renders Dr. Mueller's opinions as to competitive harm speculative and unreliable. The finding of liability under the Robinson–Patman Act cannot stand under these circumstances.

## 2. Excessive Damages

■ The financial proof of the damages which the plaintiffs sustained as a result of Rose Acre's alleged predation is insufficient to support the jury's verdict of over $9,000,000 to the seven plaintiffs. The calculations of damages presented by the plaintiffs contained unfounded assumptions which resulted in an award of damages which are totally out of line with the profit margin in the shell egg industry.

The jury awarded the plaintiffs a total of $3,223,000 in damages from the loss of net profits on the lost sales to the plaintiffs' customers which were allegedly caused by Rose Acre. In order to prove the plaintiffs' damages from loss of profits, the

plaintiffs relied on the expert testimony of Mr. Richard Hoeh, certified public accountant, who made various calculations to arrive at the damage figures adopted by the jury. Mr. Hoeh calculated each of the plaintiff's loss of net profits by first determining the volume of sales actually made by Rose Acre to a specific customer in each fiscal year. Mr. Hoeh then multiplied the dollar amount of the sales to each affected customer by a "net profit percentage" for each plaintiff. To arrive at each plaintiff's "net profit percentage" Mr. Hoeh testified that:

... I studied the individual income statements of the plaintiffs and I attempted to determine which expenses they would have had to pay in addition to those already listed on the income statement. Since many of their expenses are fixed in that they were already spent, and those expenses would not have been made or paid a second time, but many expenses would also have had to have been incurred if additional sales were made. For example, if a company would have had to buy or process more eggs it would have had to incur additional costs to ship those eggs. I judged which of those expenses would have been made if additional sales, in fact, had been realized, and I rounded that percentage to the net profit percentage amount that I have listed in the "Net Profit Percentage" column. . . .

(Hoeh Direct, p. 26.) For each plaintiff, Mr. Hoeh calculated a separate net profit percentage to be applied to the sales made by Rose Acre to the affected customer. Multiplying the dollar amount of the sale to each affected customer for each fiscal year by the net profit percentage equaled the net income which would have been realized by the plaintiff had that plaintiff effected the sales for the customer in that year. The net profit percentages ranged from 1.00% for Gressel to 5.50% for Mendelson.[9] The total of the net income figures for all the plaintiffs equaled $3,223,000, the

---

**9.** Mr. Hoeh calculated the following net profit percentages for each of the plaintiffs:

| | | | | |
|---|---|---|---|---|
| Mendelson | 5.50% | Gressel | 1.00% | |
| Hemmelgarn | 5.00% | A.A. Poultry | 5.00% | |
| Peter Produce | 5.00% | Boomsma | 3.00% | |
| | | Boomsma Mo. | 5.00% | |

amount of damages awarded by the jury to represent lost profits.

Mr. Hoeh's opinion as to Rose Acre's damages from loss of net profits lacks a sufficient factual basis to be a reliable accounting of any actual damages allegedly incurred by plaintiffs. The foundation of Mr. Hoeh's opinion are assumptions made by him which are not supported by any evidence introduced at trial. The Court recognizes that Mr. Hoeh undertook a difficult task in attempting to calculate an event that never occurred (*i.e.*, sales by the plaintiffs to the affected customers), however, even allowing some latitude for difficulty of the task, the foundation upon which his opinions are based is too speculative to support the conclusions he reached.

Through preliminary questioning by Mr. Johnstone, counsel for Rose Acre, Mr. Hoeh testified that his opinions as to lost sales by the plaintiffs assumed that all of Rose Acre's sales to each affected customer would have been realized as additional sales by the identified plaintiff. This assumption does not consider whether the individual plaintiffs would have had the capacity or the ability to sell the eggs as additional sales to the affected customers and ignores any sales the plaintiffs may have made instead of sales to those particular customers in mitigation of any losses. Mr. Hoeh's calculations as to damages begin with the first sale made by Rose Acre to any affected customer and assume that each and every sale made to that customer thereafter was an illegal sale. His opinion does not take into account the effect, if any, that "specials" may have had on the alleged lost profits but rather considers each and every sale made to a customer. Mr. Hoeh's testimony further assumes that all of the eggs which Rose Acre sold to Balberman, a whoesaler who resold eggs to a number of retailers, were resold to one customer, Allied, a customer to whom one of the plaintiffs had previously sold. Similarly, his opinion assumes that all of the eggs which Rose Acre sold to Certified were resold to Butera, a customer of one of

the plaintiffs. There is no evidence in the record which would tend to support the assumption that all of the eggs Rose Acre sold to either Balberman or Certified were, in fact, resold to only one customer. The plaintiffs' loss of profits calculations are based on too many assumptions of fact which are unsubstantiated by the factual evidence presented at trial. The resulting damages for loss of profits calculated by Mr. Hoeh are not reliable estimates.

The unrealiability and speculativeness of the calculation is further illustrated by net profit percentage calculated by Mr. Hoeh for each plaintiff. Mr. Hoeh calculated that plaintiff Mendelson had a net profit percentage of 5.5%. Practically, this means that if eggs were selling at 50 cents per dozen,[10] Mendelson's profit per dozen eggs would equal 2¼ cents per dozen eggs; if eggs were selling for 60 cents per dozen, Mendelson's profit per dozen eggs would equal over 3 cents per dozen. Testimony during the trial from witnesses for the plaintiffs and defendant was that the profit margin in the industry for processors ranged from a low of ½ cent per dozen to a high of 1 cent per dozen eggs. In the most extreme case, the net profit percentage calculated by Mr. Hoeh would allow Mendelson to recover two or three times the profit margin for the shell egg industry. The resulting damages are excessive.

The jury awarded an additional sum of over $6,000,000 to compensate the plaintiffs for the losses they allegedly suffered due to a general decline of prices in the market allegedly caused by Rose Acre's marketing and selling more eggs. This Court has fully discussed its determination that no competitive harm resulted from any of Rose Acre's sales during the relevant period because the evidence indicated a healthy, competitive market. The damages awarded the plaintiffs for harm due to a decline in price are unfounded. Because Rose Acre is an integrated producer and processor of eggs, it has advantages

---

**10.** Testimony at trial established that during the relevant period eggs sold from a low of 40 cents per dozen to a high of 60 to 70 cents per dozen.

of efficiency not available to the plaintiffs. This Court does not believe that the anti-trust laws may be used to penalize a more efficient competitor who employs new technology to increase its output. *See Dean Milk Co. v. F.T.C.*, 395 F.2d 696 (7th Cir. 1968). The fact that Rose Acre produced substantially more eggs and placed those eggs in commerce is not a sufficient basis upon which to premise damages of more than $6,000,000 for a general decline in price. Moreover, the evidence introduced by the plaintiffs to show that the prices for eggs in the "North Central Region" declined is unreliable and based upon assumptions not supported by the record. The total damages from the alleged decline in prices exceeded the plaintiffs' total profits several times over the plaintiffs' total profits earned by the plaintiffs before Rose Acre's expansion. Under these circumstances, the Court finds that a new trial is necessary to avoid a serious injustice.

### 3. Errors of Law

■ A new trial is necessary to correct two errors made by the Court in ruling on motions made by the parties. The Court granted the plaintiffs' motion for bifurcation for trial of the issues raised by the defendant's counterclaim. Rose Acre's counterclaim alleged that the plaintiffs brought their Robinson–Patman action in order to force Rose Acre to stop its competitive pricing practices and to make it more difficult for Rose Acre to expand its business. Rose Acre contends that because the plaintiffs had an improper purpose for bringing the action, the litigation is baseless and would be a "sham" within the meaning of the Noerr–Pennington doctrine. The Noerr–Pennington doctrine, was named after two Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Noerr*, the Supreme Court explained when the anti-trust laws might be implicated in certain action of competitors:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interefere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

*Noerr*, 365 U.S. at 144, 81 S.Ct. at 533. The Noerr–Pennington doctrine has been developed by the courts to include lawsuits brought by competitors solely "because of the costs litigation imposes on the other party...." *Premier Electrical Construction Co. v. National Electrical Contractors Association, Inc.*, 814 F.2d 358, 372 (7th Cir.1987) *citing Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466 (7th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). An actionable anti-trust injury may arise when an injury occurs because of the use of litigation to achieve a reduction in competition. *See Premier Electrical Construction*, 814 F.2d at 376. It is this very type of injury which Rose Acre has alleged.

■ Because the Court granted plaintiffs' motion for bifurcation, Rose Acre was precluded from offering any evidence of the plaintiffs' own pricing practices and any evidence of alleged price discussions between plaintiffs aimed at maintaining egg prices at a certain level. The exclusion of this evidence resulted in the jury receiving an incomplete view of the shell egg industry. The introduction of the evidence and trial of the counterclaim would have been entirely proper for consideration by the jury as to the alleged losses suffered by the plaintiffs. *See Dean Milk*, 395 F.2d at 712. The defendant was severely prejudiced by the one-sided picture of Rose Acre's use of specials during the relevant period without the consideration of any use of specials by the plaintiffs or as a practice generally in the industry.

■ The Court also erred in adopting the long-run incremental cost standard as a measure to determine whether Rose Acre sold eggs below cost. The application of the long-run incremental cost standard allowed the jury to consider only the allegedly surplus eggs produced by Rose Acre after the expansion of its facilities. The

long-run incremental cost standard was adopted by the Seventh Circuit in the *AT & T* case as a representation of the average cost to the defendant of adding "an entire new service or product rather than merely the last unit of production." *AT & T,* 708 F.2d at 1115. Thus long-run incremental cost measures the costs of adding a new service or product including fixed and variable costs. *Id.* The application of this standard to the present action is inappropriate because Rose Acre has not added a new product or service, but rather has only increased its production of an existing product. The labeling of the additional eggs produced by Rose Acre after its expansion as "specials" or "surplus" eggs does not change the character of the eggs. Rose Acre simply increased its capacity and produced more eggs for sale in the market. In such a case, this Court believes that the correct measure of costs is one which measures the average variable costs of producing the additional eggs resulting from the increased productive capacity of Rose Acre during the relevant period. Variable costs are costs which vary with any change in the output of a product and include such costs as materials, fuel, maintenance and labor. *AT & T,* 708 F.2d at 1115, *citing* Agreeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 709–13 (1975). *See also,* Agreeda & Turner, 88 Harv.L.Rev. at pp. 717–21. Thus a product's average variable cost equals the total of all its variable costs divided by the units of output. *AT & T,* 708 at 1115. The inclusion of fixed costs such as land and buildings in the computation of Rose Acre's costs to produce an alleged surplus of eggs rather than looking to the variable costs associated with the production of the eggs during the relevant period was prejudicial to the defendant. The Court believes that average variable cost is the correct cost standard for evaluating the predatory pricing claims in this case.

## C. *Plaintiffs' Motion for Judgment on the Amended Counterclaim*

The plaintiffs filed their Motion for Judgment on Amended Counterclaim on October 29, 1987 arguing that the jury verdict rendered on October 23, 1987 in the plaintiffs' favor precludes Rose Acre as a matter of law from recovering on its Amended Counterclaim. Because the Court has granted Rose Acre's motion for judgment notwithstanding the verdict and has vacated the jury verdict for the reasons discussed above, the basis for the plaintiffs' motion no longer exists. The Court must therefore deny the motion for judgment on the Amended Counterclaim.

If it were to become necessary to try this case again pursuant to the Court's conditional grant of the defendant's motion for a new trial, the plaintiffs' motion for judgment on the amended counterclaim must still be denied. The Court's determination that it erred by bifurcating the trial of the Amended Counterclaim and the trial of the plaintiffs' complaint for the reasons set forth fully above mandates that the issues raised in the Amended Counterclaim be fully tried at any new trial of this cause.

## APPENDIX

ROSE ACRE FARMS AND SUBSIDIARIES
CALCULATION OF ANNUAL EXPENSES ADJUSTED BY DEPRECIATION ATTRIBUTABLE
TO PLANT AND EQUIPMENT EXPANSION

| | June 30, 1980 | | June 30, 1981 | | June 30, 1982 | | June 30, 1983 | |
|---|---|---|---|---|---|---|---|---|
| | AMOUNT | PER DOZEN | AMOUNT | PER DOZEN | AMOUNT | PER DOZEN | AMOUNT | PER DOZEN |
| Total Expenses & Deductions | 31,448,649 | 0.563735 | 42,879,016 | 0.590724 | 43,797,730 | 0.588551 | 41,379,807 | 0.567649 |
| Less Provision for Fed Tax | (2,396,000) | (0.042950) | (176,000) | (0.002425) | 1,618,478 | 0.021749 | 1,351,106 | 0.018534 |
| Less Proceeds of Lawsuit | | | (460,082) | (0.006338) | | | | |
| Less Depreciation Expense | 2,514,088 | 0.045066 | 3,147,464 | 0.043361 | 2,951,291 | 0.039659 | 2,822,640 | 0.038721 |
| Subtotal | 31,330,561 | 0.561618 | 40,367,634 | 0.556126 | 39,227,961 | 0.527143 | 37,206,061 | 0.510393 |
| Plus Adjusted Depreciation: | | | | | | | | |
| 1976 - 1977 Actual | NA | NA | NA | NA | NA | NA | NA | NA |
| 1976 - 1977 % Decline | 281,165 | 0.009098 | 175,728 | 0.005686 | 70,291 | 0.002274 | 0 | 0.000000 |
| Total Adjusted Depreciation | 281,165 | 0.005040 | 175,728 | 0.002421 | 70,291 | 0.000945 | 0 | 0.000000 |
| Plus Allocation/Plant Expansion | | | | | | | | |
| FYE 1978 Increase | 443,432 | 0.014349 | 443,432 | 0.014349 | 443,432 | 0.014349 | 443,432 | 0.014349 |
| FYE 1979 Increase | 988,469 | 0.017719 | 988,469 | 0.013618 | 988,469 | 0.013283 | 988,469 | 0.013560 |
| FYE 1980 Increase | 898,489 | 0.016106 | 898,489 | 0.012378 | 898,489 | 0.012074 | 898,489 | 0.012325 |
| FYE 1981 Increase | NA | NA | 407,535 | 0.005614 | 407,535 | 0.005476 | 407,535 | 0.005591 |
| FYE 1982 Increase | NA | NA | NA | NA | 174,024 | 0.002339 | 174,025 | 0.002387 |
| FYE 1983 Increase | NA | NA | NA | NA | NA | NA | 133,438 | 0.001831 |
| Total Plant Expansion Alloc. | 2,330,390 | 0.041774 | 2,737,924 | 0.037719 | 2,911,948 | 0.039131 | 3,045,387 | 0.041777 |
| Modified Total Expenses | 33,942,116 | 0.608432 | 43,281,286 | 0.596266 | 42,210,200 | 0.567218 | 40,251,448 | 0.552170 |
| Total Income | 28,765,904 | 0.515645 | 43,536,240 | 0.599778 | 47,722,307 | 0.641289 | 43,238,727 | 0.593150 |
| Difference | 5,176,212 | 0.092787 | (254,954) | (0.003512) | (5,512,107) | (0.074071) | (2,987,279) | (0.040980) |

EXHIBIT 54

APPENDIX—Continued

ROSE ACRE FARMS AND SUBSIDIARIES
CALCULATION OF ANNUAL EXPENSES ADJUSTED BY DEPRECIATION ATTRIBUTABLE
TO PLANT AND EQUIPMENT EXPANSION

| | June 30, 1976 | | June 30, 1977 | | June 30, 1978 | | June 30, 1979 | |
|---|---|---|---|---|---|---|---|---|
| | AMOUNT | PER DOZEN | AMOUNT | PER DOZEN | AMOUNT | PER DOZEN | AMOUNT | PER DOZEN |
| Total Expenses & Deductions | 16,682,051 | | 19,073,060 | 0.596071 | 16,106,837 | 0.521183 | 22,067,315 | 0.538937 |
| Less Provision for Fed Tax | 1,793,224 | | 1,279,630 | 0.039991 | 48,000 | 0.001553 | (436,600) | (0.010663) |
| Less Proceeds of Lawsuit | | | | | | | | |
| Less Depreciation Expense | 702,912 | | 675,535 | 0.021112 | 733,978 | 0.023750 | 1,462,421 | 0.035716 |
| Subtotal | 14,185,915 | | 17,117,895 | 0.534968 | 15,324,859 | 0.495880 | 21,041,494 | 0.513884 |
| Plus Adjusted Depreciation: | | | | | | | | |
| 1976 - 1977 Actual | 702,912 | | 675,535 | 0.021112 | NA | NA | NA | NA |
| 1976 - 1977 % Decline | NA | | NA | NA | 492,038 | 0.015921 | 386,602 | 0.012510 |
| Total Adjusted Depreciation | 702,912 | | 675,535 | 0.021112 | 492,038 | 0.015921 | 386,602 | 0.009442 |
| Plus Allocation/Plant Expansion | | | | | | | | |
| FYE 1978 Increase | NA | | NA | NA | 443,432 | 0.014349 | 443,432 | 0.014349 |
| FYE 1979 Increase | NA | | NA | NA | NA | NA | 988,469 | 0.024141 |
| FYE 1980 Increase | NA | | NA | NA | NA | NA | NA | NA |
| FYE 1981 Increase | NA | | NA | NA | NA | NA | NA | NA |
| FYE 1982 Increase | NA | | NA | NA | NA | NA | NA | NA |
| FYE 1983 Increase | NA | | NA | NA | NA | NA | NA | NA |
| Total Plant Expansion Alloc. | 0 | 0 | 0 | 0.000000 | 443,432 | 0.014349 | 1,431,901 | 0.034970 |
| Modified Total Expenses | 14,888,827 | | 17,793,430 | 0.556080 | 16,260,330 | 0.526150 | 22,859,997 | 0.558296 |
| Total Income | 18,698,947 | | 20,219,916 | 0.631912 | 16,258,635 | 0.526095 | 23,463,257 | 0.573029 |
| Difference | (3,810,120) | | (2,426,486) | (0.075832) | 1,695 | 0.000055 | (603,260) | (0.014733) |

## ORDER

This cause is before the Court upon the plaintiffs' motion for summary judgment on the defendant's amended counterclaim filed October 29, 1987 and pursuant to the Court's Entry of December 28, 1987 granting the defendant's motion for judgment notwithstanding the verdict and in the alternative granting the defendant's motion for a new trial.

Whereupon the Court, having considered the motion, the memoranda in support thereof and in opposition thereto, the entry of December 28, 1987 and being duly advised in the premises now finds as follows:

1. The plaintiffs' motion should be, and hereby is, DENIED; and

2. Pursuant to Fed.R.Civ.P. 54(b), there is no just reason for delay in the entry of judgment in favor of the defendant and the Court therefore directs the entry of such judgment.

IT IS SO ORDERED.