**A.A. POULTRY FARMS, INC., et al., Plaintiffs–Appellants,**

v.

**ROSE ACRE FARMS, INC., Defendant–Appellee.**

No. 88–1426.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1988.

Decided Aug. 4, 1989.

Dorothy B. Zimbrakos, Warren S. Radler, Rivkin, Radler, Dunne & Bayh, Chicago, Ill., Alfred C. Frawley, Brann & Isaacson, Lewiston, Me., Lee B. McTurnan, McTurnan & Turner, Indianapolis, Ind., for plaintiffs-appellants.

Joe C. Emerson, Robert K. Stanley, Stephen H. Paul, Baker & Daniels, Indianapolis, Ind., for defendant-appellee.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and GRANT, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Economists frequently give agricultural products such as wheat as examples of perfect competition. Concentration is low and the product fungible. Anyone who tries to charge more than the going price loses sales quickly, making the effort unprofitable. Price closes in on marginal cost and stays there. Sellers may enter or expand output as much as they please, at the potential expense of rivals but to the definite benefit of consumers: the growing producer will be able to sell its greater supplies only at the going price or less. Growth by the more efficient producers is an engine of lower prices, to be applauded.

Rose Acre Farms is a vertically integrated egg producer and processor. Rose Acre's chickens practically lay their eggs on conveyor belts, which carry them away to be graded, sorted by size, and crated in a continuous operation. The eggs, in cartons suitable for supermarket shelves, must be sold quickly: "sell 'em or smell 'em" is the industry motto. Hens do not always cooperate by laying eggs in the grades and sizes consumers want at the moment. Unintegrated processors (firms that pack and ship eggs they purchase from farmers, called "producers") cope with this by buying only the grades and sizes they need; integrated firms that are less mechanized than Rose Acre (and firms obliged by contract with producers) sell surplus eggs to "breakers"—firms that use eggs to make bread and other finished products. Rose Acre sells its surplus not to breakers but to supermarkets, at concessionary prices.

"Specials" compete with the eggs offered by other processors. Seven of Rose Acre's rivals filed this suit, contending that the specials were priced too low, in violation of the Robinson–Patman amendments to § 2(a) of the Clayton Act, 15 U.S.C. § 13(a). Specials go for less than Rose Acre's other eggs, which the plaintiffs portray as price discrimination; the plaintiffs also maintained that Rose Acre sells the "specials" below its cost of production, which they describe as predatory. A jury agreed, returning a verdict of $9.3 million in damages, or $27.9 million after trebling. The district judge granted Rose Acre's motion for judgment notwithstanding the verdict, 683 F.Supp. 680 (S.D.Ind.1988).

---

[*] Hon. Robert A. Grant, of the Northern District of Indiana, sitting by designation.

## I

Because the jury found a verdict in the processors' favor, we take the facts and inferences in the light most favorable to them.

Rose Acre more than doubled the size of its operation between 1978 and 1982, borrowing $13 million and installing highly automated production facilities. In 1977 Rose Acre had 1.5 million laying hens; by 1982 it had 3.4 million, producing a billion eggs per year. This is approximately 1% of national production. Sales are more concentrated from regional perspectives. In 1978 Rose Acre processed 10.4% of all eggs in Indiana; by 1983 that figure was 23.1%. In a larger region (Ohio, Indiana, Illinois, Iowa, and Michigan), Rose Acre's share rose from 3.4% to 8.6%. In 1978 the four largest processors in Indiana (including Rose Acre) had a share of 20.8%; by 1982 that figure was 60.9%. (The record does not contain enough data to allow computation of the Hirfindahl–Hirschmann Index of concentration, nationally or for any region.)

Although Rose Acre more than doubled in size, national sales of eggs increased about 1% annually. Rose Acre's growth therefore came at other processors' expense. Although until 1978 Rose Acre sold almost all of its eggs within 100 miles of Indianapolis, by 1982 it had cracked markets as far away as Buffalo. To do this it offered low prices. Pricing in the egg business is based on the "Urner Barry index", a daily compendium of egg prices. Processors bid in relation to that scale—e.g., "five cents per dozen back of [= under] Urner Barry"—so that they may strike long-term deals in a fluctuating market. A buyer who receives a bid well under the Urner Barry scale is assured of a relatively good buy even though the delivered price may move up or down with the market.

The plaintiff processors squawked about the prices Rose Acre used to win the business of ten large supermarket chains. Sometimes Rose Acre prevailed on a single, low quote. For example, to wrest the business of the southern division of the Fisher–Fazio chain in Ohio away from plaintiff Gressell Produce Co., Rose Acre offered large eggs at 6¢ per dozen back of Urner

Barry if Fisher–Fazio would buy two trailer loads (24,960 dozen eggs per trailer) weekly. More frequently, Rose Acre's prices had two components: ordinary deliveries and a promise of "specials". Rose Acre got the business of Fisher–Fazio's northern division by offering a "special" price of an extra 4¢ off for one week each month. Boomsma Produce of Missouri, Inc., lost the account of Aldi–Noti in Chicago and St. Louis to Rose Acre's bid of 8¢ per dozen under Urner Barry for large eggs, plus "specials" four weeks per year at an additional 4¢ less than the index; in November 1981 Rose Acre quoted Aldi–Noti a price of 12¢ per dozen below Urner Barry for all trailer loads in excess of five per week, a deal Aldi–Noti could accept only by using Rose Acre's products in both Chicago and St. Louis—which it did, freezing out Boomsma. Deals for other supermarket chains followed a similar pattern. Plaintiffs maintain that Rose Acre did not offer similar discounts in Indianapolis, its home territory, and that the specials tapered off after Rose Acre secured the business of each chain.

Willard F. Mueller, professor of economics at the University of Wisconsin and plaintiffs' expert witness, testified that Rose Acre's pricing strategy started the egg market rolling toward oligopoly and "materially contributed to a declining price structure" in the business. Professor Mueller concluded that the prices were discriminatory because Rose Acre gave proportionally more "specials" to buyers located farther away, although the transportation costs of delivering to those customers were higher. Drawing on the work of an accounting expert, Prof. Mueller also opined that Rose Acre's prices were predatory because they were less than its average total cost, and in 1980 were 2% less than its average variable cost.

Plaintiffs finally offered evidence of predatory intent. David Rust, the president of Rose Acre, once paid a call on Phillip Gressell and said: "We are going to run you out of the egg business. Your days are numbered." Lois Rust, the firm's treasurer, answered "No" to the question "Does your cost of production have any-

thing to do with the selling price of your eggs?" She explained that Rose Acre grants specials to retailers instead of selling eggs to breakers because "it is the way to win in the long run."

Although this evidence impressed the jury, the district judge granted judgment to Rose Acre. Reversing conclusions he had articulated before and during the trial, the judge held that the evidence of bad intent could not support a verdict that was not otherwise justified by objective economic indicators. That objective information, the judge believed, was "not sufficient to find actual competitive injury in the egg market.... Even the most favorable viewing of the evidence in favor of the plaintiffs indicates a healthy, competitive market, marked by the growth of the plaintiffs and the entry and growth of other egg processors". 683 F.Supp. at 687. Evidence that plaintiff Hemmelgarn & Sons, Inc., had grown as fast as Rose Acre particularly impressed the judge, as did the fact that the gross revenues of the plaintiffs increased from $60 million in 1977 to $92 million in 1983. Entry from other firms also was impressive:

> Companies located in the areas in which Rose Acre sold its eggs which entered the market or expanded significantly include Wabash Valley Produce which grew from 2 million to 3.3 million layers; Midwest Poultry Services which grew from under 1 million to 2.25 million layers by 1983; Croton Egg Farm entered the market and grew to 2.8 million layers by 1983; Daylay Egg Farm also entered the market and grew to 1.2 million layers by 1983. Additionally, Creighton Brothers and Weaver Brothers, both located in Indiana, expanded operations and grew during this period of time.

*Ibid.* Plaintiffs contest the district court's emphasis on the growth of their revenues, pointing out that market prices drive revenues. They offer this table:

Percent Change in Cases of Eggs Sold (1978–1982)

| | |
|---|---|
| Rose Acre | 217.0% |
| Mendelson Egg | -3.4% |
| Boomsma Produce | 7.0% |
| Peter Produce | 3.0% |
| Hemmelgarn & Sons | 62.0% |
| A.A. Poultry Farms | -14.0% |
| Gressel Produce | 1.5% |

To which they add: "Given the inelastic demand for eggs and Rose Acre's dramatic expansion, the plaintiffs are the fortunate survivors."

After concluding that the egg market is competitive, the district court observed that the evidence could not support an inference of predatory intent—not only because of the vigorous competition but also because the evidence did not show that Rose Acre sold eggs for less than the appropriate measure of costs, 683 F.Supp. at 688–89. When denying summary judgment the district court had said that prices below long-run variable costs could be predatory; now it held that the plaintiffs had not produced acceptable evidence to establish what Rose Acre's long-run incremental cost was, rendering Prof. Mueller's conclusions speculative. 683 F.Supp. at 689–91. That led straight to judgment for Rose Acre.

## II

Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, makes it unlawful "to discriminate in price between different purchasers of commodities of like grade and quality", unless certain exclusions and defenses apply, "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly". When the discrimination has primary-line effects—that is, in the same industry as the person granting the discriminatory prices—the claim has much in common with a contention that the defendant engaged in predatory pricing in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. In either case, the gravamen is that the aggressor sold goods for too little money, hoping to cripple or discipline rivals so that it might sell its wares for a monopoly price later, recouping the losses and adding a hefty profit, to the detriment of consumers. Under a system of notice pleading, a party may prevail by establishing that its legal rights have been violated, whether or not it names the right statute. Because this case was litigated as if the complaint had named § 2 of the Sherman Act in addition to § 2(a) of the Clayton Act,

and the appeal has been briefed from the same perspective, we start with the question whether the plaintiffs succeed under the Sherman Act's standard.

■ Consumers, for whose benefit the antitrust laws are designed, welcome low prices but not monopoly prices. Contentions that firms practice predatory pricing—the sequence low-price-now-high-price-later—accordingly create difficult problems for courts. If a rival files suit during the "low price" period, how can a court tell whether the price is low because the defendant is an efficient producer driving down costs (or just driving price down to cost) as opposed to a predator? A price "too low" for an inefficient rival may be just right from consumers' perspective, showing only that the defendant's costs of production are lower than those of the plaintiff—for which it should receive a reward in the market rather than a penalty in the courthouse. So the plaintiff's observation that it is losing business to a rival that has slashed prices is consistent with both aggressive competition and predatory pricing. How to tell them apart?

One way is to find out whether the defendant's prices exceed its costs. If the price exceeds cost, then it reflects beneficial aggressive competition. If the price is less than cost, then it may reflect a sacrifice in the hope of suppressing competition and collecting a monopoly profit later. Much of the recent academic writing on predatory pricing tackles the subject from this perspective, and many recent cases in and out of this circuit struggle with the appropriate price-cost relation. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 431–32 (7th Cir.1980); *MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1114–23 (7th Cir.1983); Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975); Frederic M. Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv.L.Rev. 869 (1976); Oliver E. Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284 (1977).

Trying to infer (or refute) predatory conduct from the relation between price and cost is difficult business. Often a price below cost reflects only the sacrifice necessary to establish a presence in a competitive market (for example, new magazines lose money for years as they try to increase circulation and attract advertising revenue, without creating the tiniest risk of monopoly), or it could reflect the obsolescence of the product and the fact that a firm planning to leave the market does not try to cover its fully-allocated costs. See, e.g., *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48 (2d Cir.1979) (Friendly, J.) (promotional discount); *Pacific Engineering & Production Co. v. Kerr–McGee Corp.*, 551 F.2d 790 (10th Cir.1977) (sales below average total cost in declining industry). Measuring costs creates additional problems. Are advertising and research costs expensed or capitalized? How does one allocate the cost of activities that have joint products? Agencies engaged in ratemaking struggle with these problems for years, even decades, without producing clear answers. If we could measure costs, what would be the right benchmark? Short-run variable cost? Long-run variable cost? Average total cost? Any of these (and there are more measures) might be best in a given case, depending on the strategy the aggressor has selected and the length of time it will take to succeed. Efforts to measure Rose Acre's cost of production and contrast it with price made this a complex case.

A second approach to separating aggressive competition from predation concentrates on the defendant's intent. If a seller plans to drive out competition by fowl means, then the court infers that its price is unlawfully low now and will be too high later. Frequently courts use intent to resolve ambiguities in interpreting price-cost data; sometimes, though, courts assume that bad intent is unlawful and use price-cost data to infer it, e.g., *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1496 (11th Cir.1988). "Some courts almost seem to overlook the fact that predatory pricing is the evil, and write sometimes as if the conduct is important only because it is evidence of the firm's evil intent." Phillip E. Areeda & Herbert Hovenkamp, *Anti-*

*trust Law* ¶ 714.2b n. 5 (1988 Supp.). Still other courts have held that intent is irrelevant in predatory pricing cases, e.g., *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir.1983). We shall return to intent.

The third approach looks at the back end, the "high price later" part of the predatory sequence. Predatory prices are an investment in a future monopoly, a sacrifice of today's profits for tomorrow's. The investment must be recouped. If a monopoly price later is impossible, then the sequence is unprofitable and we may infer that the low price now is not predatory. More importantly, if there can be no "later" in which recoupment could occur, then the consumer is an unambiguous beneficiary even if the current price is less than the cost of production. Price less than cost today, followed by the competitive price tomorrow, bestows a gift on consumers. Because antitrust laws are designed for the benefit of consumers, not competitors, see *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399–400 (7th Cir.1989), a gift of this kind is not actionable.

Contemporary cases strongly favor using this third approach whenever possible. The two most recent predatory pricing cases in the Supreme Court, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), employ it, each holding that recoupment would be so unlikely that antitrust inquiry could not be justified. So too with our own most recent decision on point, *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir.1989). See also Paul L. Joskow & Alvin K. Klevorick, *A Framework for Analyzing Predatory Pricing Policy*, 89 Yale L.J. 213 (1979), recommending the use of this filter. It is much easier to determine from the structure of the market that recoupment is improbable than it is to find the cost a particular producer experiences in the short, middle, or long run (whichever proves pertinent). Market structure offers a way to cut the inquiry off at the pass, to avoid the imponderable questions that have made antitrust cases among the most drawnout and expensive types of litigation. Only if market structure makes recoupment feasible need a court inquire into the relation between price and cost.

Making likelihood of recoupment the initial hurdle avoids not only questions of cost but also questions of intent, for if a price below cost is lawful when it cannot lead to monopoly, then the defendant's state of mind becomes irrelevant. Sacrificing profits today benefits consumers; that the defendant *knows* it is sacrificing profits does not reduce this benefit. Suppose we assume that every sacrifice of profit (meaning, roughly, sales below cost) is an attempt to engage in predatory pricing. If the attempt fails, consumers are better off, and the aggressor suffers an automatic penalty. It surrenders the profits it could have made by charging the higher market price. Because unsuccessful predation is unprofitable, it is bootless for the legal system to intervene, see *Matsushita*, 475 U.S. at 595, 106 S.Ct. at 1360; self-deterring conduct is not apt to be repeated, and if it is the consumer will receive still another boon. Reference to intent could not help the court determine whether recoupment is possible, and unless recoupment lies in store even the most vicious intent is harmless to the competitive system.

Several other compelling reasons support the conclusion that intent plays no useful role in this kind of litigation. Firms "intend" to do all the business they can, to crush their rivals if they can. " '[I]ntent to harm' without more offers too vague a standard in a world where executives may think no further than 'Let's get more business,' " *Barry Wright*, 724 F.2d at 232. Rivalry is harsh, and consumers gain the most when firms slash costs to the bone and pare price down to cost, all in pursuit of more business. Few firms cut price unaware of what they are doing; price reductions are carried out in pursuit of sales, at others' expense. Entrepreneurs who work hardest to cut their prices will do the most damage to their rivals, and they will see good in it. You cannot be a sensi-

ble business executive without understanding the link among prices, your firm's success, and other firms' distress. If courts use the vigorous, nasty pursuit of sales as evidence of a forbidden "intent", they run the risk of penalizing the motive forces of competition. *Indiana Grocery*, 864 F.2d at 1413; *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986).

Almost all evidence bearing on "intent" tends to show both greed-driven desire to succeed and glee at a rival's predicament. Take, for example, the statement David Rust made to Phillip Gressell: "We are going to run you out of the egg business. Your days are numbered." Undoubtedly Rust wanted to leave Gressell scratching in the dust, but drive to succeed lies at the core of a rivalrous economy. Firms need not like their competitors; they need not cheer them on to success; a desire to extinguish one's rivals is entirely consistent with, often is the motive behind, competition. Or take Lois Rust's statement that Rose Acre's prices were unrelated to its costs. Plaintiffs treat this as a smoking gun. Far from it, such a statement reveals Rose Acre to be a price taker. In perfect competition, firms must sell at the going price, no matter what their own costs are. High costs do not translate to the ability to collect a high price; someone else will sell for less. Monopolists set price by reference to their costs (to be precise, they set quantity where marginal cost equals marginal revenue, a measure reflecting the shape of the market's demand curve, and charge the price the market will bear at that quantity); competitors set price by reference to the market. A predator, too, is highly sensitive to its costs of doing business; it calculates how much sacrifice it needs to make (and could bear), and uses that as the basis of its prices. So the statement that Rose Acre does not pay attention to its own costs when setting price reveals that the firm was acting as a competitor rather than a monopolist. Yet statements of this sort readily may be misunderstood by lawyers and jurors, whose expertise lies in fields other than economics.

Intent does not help to separate competition from attempted monopolization and invites juries to penalize hard competition. It also complicates litigation. Lawyers rummage through business records seeking to discover tidbits that will sound impressive (or aggressive) when read to a jury. Traipsing through the warehouses of business in search of misleading evidence both increases the costs of litigation and reduces the accuracy of decisions. Stripping intent away brings the real economic questions to the fore at the same time as it streamlines antitrust litigation. Although reference to intent *in principle* could help disambiguate bits of economic evidence in rare cases, *MCI v. AT & T*, 708 F.2d at 1123 n. 59, the cost (in money and error) of searching for these rare cases is too high— in large measure because the evidence offered to prove intent will be even more ambiguous than the economic data it seeks to illuminate. Professors Areeda and Hovenkamp therefore suggest that intent be removed as a subject in predatory pricing cases, see Phillip E. Areeda, 7 *Antitrust Law* ¶ 1506 (1986); Areeda & Hovenkamp, *Antitrust Law* ¶ 714.2 (1988 Supp.), and we are persuaded that this is the right approach. None of our earlier predatory-pricing cases founds liability on the basis of intent, so the subject is open to full consideration. We have previously removed intent as a basis of liability in other parts of antitrust law, e.g., *Schachar*, 870 F.2d at 400 (intent without effect may not be the basis of liability in a § 1 case); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 379–80 (7th Cir.1986) (liability under § 2 for abuse of monopoly power stems from anti-competitive effects and not intent); *Ball Memorial*, 784 F.2d at 1338–40. Following the First Circuit's decision in *Barry Wright*, we now hold that intent is not a basis of liability (or a ground for inferring the existence of such a basis) in a predatory pricing case under the Sherman Act. We respectfully disagree with the Eleventh Circuit's opinion in *McGahee* and occasional, similar, decisions elsewhere, e.g., *William Inglis & Sons Baking Co. v. ITT Continental Bak-*

*ing Co.*, 668 F.2d 1014, 1027–28 (9th Cir. 1981).

■ Rose Acre could not have recouped a predatory investment in the egg business. Plaintiffs' economic expert witness testified that prices were falling, and as in *Matsushita* could not have been expected to rise—at least not because of what Rose Acre did. Throughout 1978–82, other firms were entering the business or expanding as fast as Rose Acre. "The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." *Matsushita*, 475 U.S. at 589, 106 S.Ct. at 1357 (emphasis in original). An expanding firm in a stagnant market inevitably puts downward pressure on prices, the opposite of the concern underlying the Sherman Act. Persistent entry and expansion by other firms at the same time ensures that recoupment cannot occur. Monopoly pricing comes from reductions in output, as consumers bid for the remaining supply. *NCAA v. University of Oklahoma*, 468 U.S. 85, 103–08, 104 S.Ct. 2948, 2961–63, 82 L.Ed.2d 70 (1984); *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979); *Indiana Grocery*, 864 F.2d at 1413–14; *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 368–71 (7th Cir.1987). Try as it might, Rose Acre did nothing to stem the inflow of productive capacity. Even the plaintiffs grew, at an average rate exceeding the national market's 1% per annum.

Market structure, too, made recoupment impossible. Egg production is unconcentrated. Egg processing is a little more so, but Rose Acre's 1% share on a national basis hardly gave it the power to raise price. Plaintiffs observe that the four-firm concentration ratio in Indiana was about 64% in 1983, but Indiana is not a relevant market. We know that Rose Acre sold eggs in Buffalo, more than 500 miles away, and that Boomsma, with its principal facilities in Iowa, sold in Ohio. Any given customer apparently could turn to processors within 500 miles as sources of supply. "A market is the set of sellers to which a set of buyers can turn for supplies at existing or slightly higher prices." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989). Concentration therefore should be measured from customers' perspectives, to find out whether one firm's reduction in output would induce the customer to pay more. Boeing may be the only manufacturer of airframes in Renton, Washington, and IBM the only manufacturer of computers in Armonk, New York, but a customer in either place would not face a monopolist. Plaintiffs did not compute the concentration or HHI ratios from any customer's point of view. Every indication in the record, though, suggests that each of the ten supermarket chains had and has ample potential sources of supply. Cases frequently say that as a matter of law single-firm shares of 30% or less cannot establish market power. E.g., *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 26, 104 S.Ct. 1551, 1565, 80 L.Ed.2d 2 (1984); *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 612–13, 73 S.Ct. 872, 882–83, 97 L.Ed. 1277 (1953); *United States v. Alcoa*, 148 F.2d 416, 424 (2d Cir.1945) (one-third insufficient; dictum); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980) (one-third insufficient). *Cf. Ball Memorial Hospital*, 784 F.2d at 1334–37 (even shares exceeding two-thirds do not confer power over price if entry is easy). None of the customers was facing a seller with close to a third of the market, and none faced a serious prospect of monopoly prices tomorrow in exchange for cheap eggs today.

Plaintiffs hint darkly that after Rose Acre secured a new supermarket chain, it cut back on the number of "specials" offered, thus raising price. So long as the plaintiffs and other processors continue operating, however, any attempt by Rose Acre to raise price creates fresh opportunities for its rivals—and for the other firms that have been flocking to the business. Supermarkets seem happy with Rose Acre; none filed suit or testified on behalf of the plaintiffs. As we emphasized in *Indiana Grocery* and *Ball Memorial Hospital*, courts should treat with great skepticism complaints by competitors who are injured

by the low prices that customers adore, when the customers are content. Our review of the record leads us to agree with the district court that no rational jury could have found that recoupment took place, could have taken place, or conceivably could take place in the future. To the contrary, the overwhelming impression left by this record is that Rose Acre beat its rivals to the punch in automating production and used its lower costs to take business away from them. New entrants with modern technology have flourished; stodgy firms have stagnated. This is what competition is all about, and to penalize it in the name of antitrust would do a great disservice to consumers.

### III

■ To conclude that Rose Acre did not engage in predatory pricing is not necessarily to absolve it under the Robinson–Patman Act. Despite the language of that statute, penalizing primary-line discrimination "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly", the Supreme Court held in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), that price discrimination in an oligopolistic market contributing to the erosion of price levels may violate the statute. Scholars have cogently argued that *Utah Pie* employed the Robinson–Patman Act to condemn the process by which competition creeps into oligopolistic markets and undercuts excessive prices. See, e.g., Richard A. Posner, *The Robinson–Patman Act: Federal Regulation of Price Differences* 12–15, 38 (1976); Ward S. Bowman, *Restraint of Trade by the Supreme Court: The Utah Pie Case*, 77 Yale L.J. 70 (1967). Cf. United States Department of Justice, *Report on the Robinson–Patman Act* (1977) (expressing doubt about the benefits of the Robinson–Patman Act as a whole); Kenneth G. Elzinga & Thomas F. Hogarty, *Utah Pie and the Consequences of Robinson–Patman*, 21 J.L. & Econ. 427 (1978) (tracing the demise of Utah Pie Co. despite shelter from competition).

Nary a voice has been heard in support of *Utah Pie* in years. The universal academic disdain for that case, coupled with the lack of recent reaffirmation by the Supreme Court, has led several courts of appeals to conclude that the standard of primary-line liability under the Robinson–Patman Act should be the same as that under § 2 of the Sherman Act, e.g., *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1345 (8th Cir.1987); *D.E. Rogers Associates, Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1439 (6th Cir.1983); *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir.1977), a conclusion professors Areeda, Turner, and Hovenkamp endorse. See Phillip Areeda & Donald F. Turner, 3 *Antitrust Law* ¶ 720c (1978); Areeda & Hovenkamp at ¶ 720′ (collecting cases at p. 573 n. 1). Courts and commentators give a reason and an excuse. The reason is that if judges employ the best feasible test for predatory pricing in § 2 cases, it is mischievous to use a different (necessarily inferior) test under the Robinson–Patman Act. (If the courts 'don't use the right approach under the Sherman Act, this approach continues, then they should devise a better one rather than use different tests under different statutes). The excuse is that the Robinson–Patman Act prohibits only price discrimination that "may ... substantially ... lessen competition or tend to create a monopoly", which under modern cases refers to consumers' welfare, not producers' comfort. An excuse it is, however, because *Utah Pie* took a different view of things.

Widespread civil disobedience in the judiciary in response to *Utah Pie* parallels the response to *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), another almost friend-less antitrust decision from the same Term of Court. The substantial ingenuity devoted to getting 'round *Schwinn* was one of the factors contributing to its demise. See *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 48 n. 14, 97 S.Ct. 2549, 2556 n. 14, 53 L.Ed.2d 568 (1977) (overruling *Schwinn*). Although *Schwinn* bit the dust, the Court has yet to revisit *Utah Pie*. One could say that in the intervening years the Supreme Court has repeatedly said that, whenever possible, standards under the Robinson–Patman Act

should be conformed to standards under other antitrust laws. E.g., *Great Atlantic & Pacific Tea Co. v. FTC,* 440 U.S. 69, 80 & n. 13, 99 S.Ct. 925, 933, & n. 13, 59 L.Ed.2d 153 (1979); *United States v. United States Gypsum Co.,* 438 U.S. 422, 457–59, 98 S.Ct. 2864, 2883–84, 57 L.Ed.2d 854 (1978). For the reasons we canvassed in Part II of this opinion, "ordinary" antitrust standards suggest giving Rose Acre a medal rather than requiring it to pay $28 million in damages, which exceeds its net worth. But there is a difference between an interpretive approach, a means of resolving ambiguities ("When in doubt, read the Robinson–Patman Act to protect consumers' rather than producers' welfare"), and authorization to disregard cases that have laid down rules. No case since *Utah Pie* questions its *holding,* as opposed to its outlook. Inferior federal courts, in order to provide equal justice under law, must apply the holdings of cases still on the books. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* — U.S. ——, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983). Sometimes the imminent demise of a precedent may be plain, as when it rests wholly on an opinion since overruled, and in such cases an inferior court may apply today's law sure that the empty shell will break under the slightest pressure. E.g., *Limbach v. Hooven & Allison Co.,* 466 U.S. 353, 104 S.Ct. 1837, 80 L.Ed.2d 356 (1984); *United States v. Burke,* 781 F.2d 1234, 1239 n. 2 (7th Cir.1985); *United States ex rel. Spurlark v. Wolff,* 699 F.2d 354, 357–61 (7th Cir.1983) (en banc); *Norris v. United States,* 687 F.2d 899, 902–03 (7th Cir.1982). When the case stands unquestioned, however, a belief that the Court would not reach the same decision today if the question were open anew is not a basis for disregarding the law on the books.

Separating a case that is dead but unburied from a case that is living on borrowed time is hard yet important. Many's the time the Supreme Court says, using one formula or another: "We might not adopt this interpretation today, but we will not overrule it either." Antitrust law has its

share. E.g., *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (reaffirming two earlier holdings that baseball is not "interstate commerce" and so is not covered by the antitrust laws); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (declining to discard the 40–year–old "filed rate doctrine"). At the same time, antitrust doctrines equal in pedigree and antiquity have been jettisoned. E.g., *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (overruling the 40–year–old intercorporate conspiracy doctrine); *Sylvania* (overruling *Schwinn* ). It is presumptuous—more, it produces uncertain and unequal application of the law—for an inferior court to act on a belief that a given decision will be among the handful that the Supreme Court overrules or significantly limits.

A court could of course "reconcile" the Robinson–Patman and Sherman Acts the way the Eleventh Circuit recently did, holding in *McGahee,* 858 F.2d at 1493 n. 9, that the two have the same meaning and then conforming the Sherman Act's standard to that of the Robinson–Patman Act, *id.* at 1496–1501. That approach, however, drives the definition of predatory pricing under the Sherman Act away from *Matsushita* and *Cargill* just as surely as the other kind of reconciliation slights *Utah Pie.* Sherman Act cases should be approached as we have done in Part II; Robinson–Patman cases, for now at least, follow the approach of *Utah Pie.*

*Utah Pie* holds that the Robinson–Patman Act condemns at least some primary-line price discrimination that the Sherman Act permits. Just as we may not properly inter that case, so we ought not give it a crabbed reading in order to heave out the rear door what we welcomed in the front. The frozen pie market, the subject of *Utah Pie,* was more concentrated than the egg business, but it would be unprincipled to say that the level of concentration in *Utah Pie* is the lowest sufficient under the Robinson–Patman Act, especially when the Court described the frozen pie market as "highly competitive", 386 U.S. at 703, 87

S.Ct. at 1336. Moreover, *Utah Pie*, like other Robinson–Patman cases before it, recited that "predatory intent" coupled with "unreasonably low prices" may be the basis of liability, 386 U.S. at 696 n. 12, 87 S.Ct. at 1332 n. 12 (citing cases), so our conclusion that resort to intent under § 2 of the Sherman Act creates substantial prospect of injury to competition and needlessly complicates litigation does not support a judgment *in this court* taking intent outside the pale of Robinson–Patman litigation. *Utah Pie* held that the firm taking the lead in reducing prices may be liable on account of a "drastically declining price structure" in a "highly competitive" market. 386 U.S. at 703, 87 S.Ct. at 1336. Antithetical as the notion of liability for vigorous competition leading to low prices is to contemporary antitrust policy, our job is application.

The egg market is highly competitive, and the jury could have believed that Rose Acre's pricing contributed to a declining price structure, causing its rivals injury (lost sales) as a result. The evidence of "intent" in this case does not differ in kind from the sort in other Robinson–Patman cases: it shows that the defendant wanted to grab as much business as it could and was not picky about how. *Utah Pie* said that "actual intent to injure another competitor", 386 U.S. at 702–03 n. 14, 87 S.Ct. at 1336 n. 14, would suffice, without remarking on the fact that intent to do all the business you can and intent to take business away from, even crush, rivals are two sides of the same coin. Although a few references in *Utah Pie*, e.g., 386 U.S. at 701, 87 S.Ct. at 1335; cf. *Matsushita*, 475 U.S. at 584–85 n. 8, 106 S.Ct. at 1354–55 n. 8, imply that the relation between price and cost matters, the Court had in mind a measure of average total cost rather than of variable or marginal costs, 386 U.S. at 698, 87 S.Ct. at 1333 (referring to direct cost plus allocated overhead), and the jury in this case would have been entitled to conclude that Rose Acre sold some of its eggs, some of the time, for less than average total cost.

This drives us almost to the point of reversing the district court—almost, but not quite. An enduringly competitive structure might offer Rose Acre safe harbor, see *Dean Milk Co. v. FTC*, 395 F.2d 696 (7th Cir.1968). We needn't say because one more ingredient is missing: price *discrimination*, as the Robinson–Patman Act uses that term. Without it plaintiffs' case won't fly, as they lose a standard predatory pricing claim for reasons we have covered.

Section 2(a) says "price discrimination" but means "price difference". *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). Economic (as opposed to legal) price discrimination occurs when a firm sells products at different price-cost ratios. George J. Stigler, *The Theory of Price* 210 & n. 13 (4th ed. 1987). A seller that charges all of its customers the same price probably is engaged in economic price discrimination, because the costs of supplying the goods vary with distance. So if Rose Acre charged customers in Indianapolis and Buffalo the same price, it was discriminating in favor of the supermarket in Buffalo by absorbing freight. But under the Robinson–Patman Act, a firm is entitled to charge the same price to everyone even though its costs differ. Indeed, price differences that follow cost differences are treated as (legal) price discrimination and must be justified, see the first proviso to § 2(a). This puts a big hole in plaintiffs' case, because Professor Mueller testified that Rose Acre engaged in three kinds of price discrimination, of which the first was charging the same price to customers in different cities. Economic price discrimination this undoubtedly was; legal price discrimination it just as surely was not. Frederick M. Rowe, *Price Discrimination Under the Robinson–Patman Act* 87–99 (1962).

Dr. Mueller testified that Rose Acre engaged in two other kinds of price discrimination: it gave different numbers of "specials" to different customers, and it charged different prices (meaning different discounts off the Urner Barry index) to different customers. Both of these propositions are superficially true. Recall the evidence about sales to Fisher–Fazio and Aldi–Noti. Rose Acre offered these two chains different numbers of specials per

year and different discounts off the Urner Barry index. Complications set in, though, once we introduce two other features: timing and net prices.

Start with timing. Suppose in July 1981 Rose Acre offers all of its customers a price 6¢ back of Urner Barry for truckload quantities of large eggs, and in January 1982 a discount of 8¢ for the same quantities. This is not discrimination but uniformity. But if one supermarket takes the offer in July 1981 and signs up for a year, and another takes the offer in January 1982, the prices paid by the two will differ—but without legal price discrimination. No one supposes that a seller must charge the same price on contracts signed at different times, or on long-term contracts and spot sales. See Rowe, *Price Discrimination Under the Robinson–Patman Act* at 50. Whether Rose Acre engaged in price discrimination as the Robinson–Patman Act uses that term depends on whether it charged the same price to customers at the same time. *Texas Gulf Sulphur Co. v. J.R. Simplot Co.*, 418 F.2d 793, 806 (9th Cir.1969). Prof. Mueller did not address that question. The only evidence we could find on the subject suggested that at any given moment Rose Acre was offering the same terms to anyone who then signed on as a customer.

Next consider the computation of the price each customer paid. Plaintiffs, through Dr. Mueller, maintained that the *principal* kind of discrimination was between Rose Acre's regular prices and its "specials". One week Rose Acre would sell large eggs for 6¢ back of Urner Barry, and the next week for 10¢ under the index. Most of Mueller's time on the stand was devoted to detailing differences in the number of weeks for which different customers were eligible for "specials".

No case of which we are aware holds, however, that fluctuations over time to the same customer are "price discrimination" within the meaning of the Robinson–Patman Act. Consider two contracts: Rose Acre agrees to sell the first supermarket 100% of its needs for 8¢ under Urner Barry, and the second supermarket 67% of its requirements for 6¢ under Urner Barry and the other 33% for 12¢ back of the

index. Plaintiffs, through Dr. Mueller, treat this as price discrimination twice over: first the base prices differ, and then the number of "specials" differs. Yet the two supermarkets are getting the identical price: 8¢ under the index for 100% of their eggs. Selling a chain 100% of its requirements at 80¢/dozen is the same as furnishing 80% of the requirements at $1.00/dozen and giving it the other 20% for "free." Whether price discrimination has occurred depends, therefore, on the price *after* all discounts, specials, and so on. See *Fruitvale Canning Co.*, 52 F.T.C. 1504, 1520 (1956); Julian O. von Kalinowski, 4 *Antitrust Laws and Trade Regulation* § 27.03[2] (1988 ed.) (collecting sources).

Asked at trial whether he had computed the mean price paid by customers after blending in the specials, Dr. Mueller said no. He computed the percentage of eggs sold to a given customer at any kind of "special" price, but not the blended price paid. Asked at oral argument whether it would be possible to whip up the blended price from the record, counsel for the plaintiffs said only that Rose Acre's pricing information was there—in carton upon carton full of forms. Plaintiffs did not try to use this information; the jury did not have it; we could not derive it without Herculean labors.

Especially not when § 2(a) reaches only discrimination in the price of goods of "like grade and quality". "Specials" were not necessarily the same grade and quality as Rose Acre's other sales. Integrated producer-processors have a problem that other processors do not necessarily face: the chickens don't lay to order. Marcus Rust, another of the family members responsible for running Rose Acre, testified without contradiction that "we could not control the size of the eggs that the chickens laid.... When you are on an in-line operation you get what the chicken produces." What customers want at the moment may be something else again. Rose Acres crates the eggs almost as soon as they are laid, then stores them in coolers 'til customers want that size and grade. If too much of one size and grade accumulates, Rose Acre could sell to "breakers" only by taking the

**1408**

eggs out of the cartons, at extra cost, and shipping in bulk. The alternative is to sell at special prices. Rose Acre "guaranteed" specials to customers, but it chose the timing of the specials and the eggs delivered, with an eye to reducing its overstock. Although "special" eggs as delivered may be physically indistinguishable to the buyer, they are not fundamentally the same good, for the same reason a seat on the 6:00 a.m. flight from Chicago to New York is not the same as a seat on the 5:00 p.m. flight, and a seat on the 5:00 p.m. flight reserved two weeks in advance is not the same as a seat on that flight for which the passenger had to stand by. Professor Mueller needed to account for the fact that some, perhaps most, of the specials were not "like" eggs sold on long-term contract; he did not.

Proving price discrimination was plaintiffs' burden, yet they introduced only poultry evidence. The closest they came was in Exhibit 61, which summarizes differences in the value of the discounts different customers received—and fails because it does not take into account differences in the base price from which the discounts were calculated. Exhibits (such as 52–8–C) that average prices to given customers over a year ignore the specials; the few efforts to compute average benefits of specials disregard the base prices (and the fact that the base contracts may have been entered into at different times). Professor Mueller conceded on cross-examination that the average discount given to any of the ten chains about which plaintiffs are concerned departed by no more than 0.8% from the average discount to Rose Acre's customers as a group, so small variations in the base price easily could wipe out the differences.

We recognize that Rose Acre did not keep its records in a way that conduces to finding average delivered prices, and that putting together the necessary information would have required a great deal of work. Yet given the formidable advantages a plaintiff enjoys under the Robinson–Patman Act once it shows price discrimination, we are not disposed to allow it to stint on the demonstration. For all we can tell—for all the jury could have told—Rose Acre offered uniform blended prices to customers at any particular time for like-quality goods. Plaintiffs failed to prove an essential element of their case, and the judgment is therefore

AFFIRMED.