AMERICAN ACADEMIC SUPPLIERS, INCORPORATED, Plaintiff–Appellant,

v.

BECKLEY–CARDY, INCORPORATED, Defendant–Appellee.

No. 90–2273.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1990.

Decided Jan. 17, 1991.

Richard P. Campbell, Anthony S. DiVincenzo, Chicago, Ill., for plaintiff-appellant.

Lee A. Freeman, Jr., Scott R. Williamson, Freeman, Freeman & Salzman, Chicago, Ill., Lewis R. Clayton, Robert L. Ernst, Aidan Synnott, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant-appellee.

Before POSNER and RIPPLE, Circuit Judges, and GRANT, Senior District Judge.[*]

POSNER, Circuit Judge.

This is a suit, primarily under federal antitrust law, seeking damages and an injunction. The plaintiff, American Academic Suppliers, a distributor of educational supplies to schools, charges that one of its competitors, Beckley–Cardy, is attempting to monopolize the market for such supplies in Ohio and Illinois, in violation of section 2 of the Sherman Act, by charging discriminatory below-cost prices, thereby violating section 2(a) of the Clayton Act (as amended by the Robinson–Patman Act) as well. 15 U.S.C. § 13(a). There are pendent claims (also supported by the diversity jurisdiction) under Illinois and Ohio law, charging Beckley–Cardy with a variety of unfair and deceptive practices. For the most part these claims duplicate the federal antitrust claims, but they include a charge that Beckley–Cardy disparaged American Academic Suppliers in a letter that it sent to customers. The district judge granted summary judgment for Beckley–Cardy on all counts and dismissed the suit.

The modern conception of the Sherman Act is of a statute that seeks to protect consumers from monopolistic practices rather than competitors from competitive practices. *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401 (7th Cir.1989), and cases cited there. To establish an attempt to monopolize in violation of the Act, therefore, the plaintiff must show that there is a substantial danger that the defendant's conduct, if allowed to continue, will harm consumers. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413–16 (7th Cir.1989). That is a difficult showing to make in a case such as this where the conduct in question consists primarily of charging lower prices. Consumers like lower prices. The plaintiff must therefore show that the defendant's lower prices today presage higher, monopolistic prices tomorrow. *Id.* at 1414–16; *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, *supra*, 881 F.2d at 1401. If undisputed facts make this sequence highly unlikely, the defendant is entitled to summary judgment. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–95, 106 S.Ct. 1348, 1356–61, 89 L.Ed.2d 538 (1986).

The sequence *is* highly unlikely unless the defendant already has monopoly power—the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supercompetitive price untenable. If he does not have such power, he will not be able to recoup the losses sustained in pricing below cost by later raising his price above the competitive level. *Id.* at 589, 106 S.Ct. at 1357. In that event the below-cost pricing will only benefit, and not harm, consumers, either in the long run or in the short run.

To say that to be guilty of attempted monopolization a defendant must have monopoly power (because otherwise

* Hon. Robert A. Grant, of the Northern District of Indiana, sitting by designation.

his attempt does not have a dangerous probability of succeeding) may seem to collapse the two offenses of monopolization and attempted monopolization into one. Not so. To have a monopoly and to monopolize are two separate things. The offense of monopolization is the acquisition of monopoly by improper methods or, more commonly—as in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945), and most of the other famous monopolization cases—the *abuse* of monopoly, the latter occurring for example when a monopolist by pricing below cost succeeds in repelling or intimidating new entrants or extending his monopoly into new markets. Firms found guilty of attempting to monopolize are typically, and in predatory pricing cases must always be, monopolists.

 The smaller the defendant is in his market and the less time and money it takes for a new firm to enter that market, the less plausible is an inference that the defendant has monopoly power. Beckley–Cardy buys from manufacturers a vast array of educational supplies, ranging from school desks to maps to crayons and excluding only food and textbooks, lists them in its catalog, and resells them to public and private schools throughout the country. It employs a sales force to call on school purchasing agents; the salesmen are empowered to negotiate discounts from the catalog prices. Beckley–Cardy has hundreds of competitors, and its share of the entire educational supplies market (as defined above), nationwide, does not exceed 3 percent although there are categories of supplies in which it has a regional "market" share in excess of 25 percent. Not only has Beckley–Cardy a horde of existing competitors, but new entry is exceedingly easy, as the facts of this lawsuit show. In 1984 the then president of Beckley–Cardy left to form his own firm—American Academic Suppliers. The original capital, contributed by him and others, was slightly less than $500,000. His strategy for gaining a foothold in the market was to hire salesmen whom he had known at Beckley–Cardy. It was a strategy easily implemented, because Beckley–Cardy had failed to

negotiate for noncompete clauses in its contracts with the salesmen.

In 1987, Beckley–Cardy raised the prices listed in its catalogs. Whether as a consequence of the price increase, or of the accelerating "theft" of Beckley–Cardy's salesmen by American Academic Suppliers, or both, American Academic Suppliers' sales soared that year and Beckley–Cardy's plummeted. Beckley–Cardy responded the following year by reducing its catalog prices nationwide by 5 to 12 percent and by offering a discount of 25 to 40 percent off the catalog prices on approximately 30 percent of its line in those parts of Ohio and other states in which American Academic Suppliers was making heavy inroads. The discount was in effect for eleven months. It was terminated when this suit was brought, although the causal relation between these events is in question. It was in a letter announcing the discount to some of its customers that Beckley–Cardy allegedly disparaged American Academic Suppliers. The letter did not refer to any firm by name but did note that the salesman who had serviced the customers' accounts for Beckley–Cardy had "resigned to accept new employment," and it went on to warn the customer that "you will probably be approached by firms offering you outlandish promises of service and prices. In most cases, because of lack of facilities, they will not be in a position to fill your order completely or on time."

The price cutting and the letter did not drive American Academic Suppliers out of any area. In fact its sales continued to grow during the period in which the discount was in force.

It is difficult, to say the least, to see how the discount, steep as it was, contained a hidden menace to the consumers who lapped it up. Suppose the discount had been continued until American Academic Suppliers cried "uncle" and left the business. The discount probably could not have done this no matter how long continued. It was on only a fraction of the total product line of both Beckley–Cardy and American Academic Suppliers. So at most it would have driven the latter from a

portion of its business, leaving it free to reenter that part of the market as soon as Beckley–Cardy raised prices in an attempt to recoup the losses sustained by it during the period when it was discounting. But forget this point and the cognate point that the discount was not in force in all the geographical areas in which American Academic Suppliers sold, and assume that American Academic Suppliers would have folded under the blast by the end of two years. Had Beckley–Cardy then tried to raise its prices, a few, at least, of the more enterprising of its hundreds of other competitors would have jumped at the opportunity to increase their sales by not raising their prices, or by raising them less. Beckley–Cardy's effort at recoupment would have failed. Consumers never would have paid the piper for the discounts they had enjoyed earlier.

Notice that the longer it took Beckley–Cardy to drive American Academic Suppliers out of business, the longer Beckley–Cardy would be required to charge supra competitive prices in order to recoup its losses. We know that eleven months was not enough to drive out American Academic Suppliers. Suppose two years would have been enough. Then to inflict a net loss on consumers Beckley–Cardy would have had to charge, for more than two years (because of the time value of money, a dollar saved today is worth more than a dollar lost tomorrow), prices farther above the competitive price than its discount prices had been below it, assuming unrealistically that it would have had the same volume at the higher as at the lower price. (If it would have sold less at the higher price, it would have had to jack up that price still higher in order to recoup its earlier losses.) How could it have done that, facing, as it would have been, hundreds of competitors? It has no patents, no vast reserves of capital, no trade secrets, no trademarks, no deep reservoir of customer goodwill (its purchasers are institutions, not individuals), no other durable competitive advantages that would enable it to raise prices without fear that its competitors by failing to follow suit would make the price increase impossible to maintain. The speed with which American Academic Suppliers became a formidable competitor, even though its initial capital endowment was only a few hundred thousand dollars, testifies to the lack of entrenched advantage of established firms. If it went under, there would be others to take its place—there *are* others, the hundreds of firms already in the market, none of whom (so far as appears) is cowed by Beckley–Cardy. The danger to consumers is trivial.

But if Beckley–Cardy has no monopoly power, the plaintiff's able lawyer ripostes, how was it able to raise its prices in 1987? Or to maintain discriminatory prices during the eleven-month period in 1988 when it was selling at a 40 percent discount in parts of Ohio, 25 percent in Illinois, and at no discount elsewhere? And if, as we must assume for purposes of this appeal, the discounts brought Beckley–Cardy's prices below its incremental cost, why did it offer so large a discount unless it anticipated being able to charge a monopoly price later on?

These things would indeed be anomalies in a competitive market that was in perfect equilibrium, but that is a state reached only in economics textbooks. The 1987 price increase was a flop, and was rescinded the next year by a price cut to all of Beckley–Cardy's customers (because the new price was published in the firm's catalog, which goes to all its customers). The fact that Beckley–Cardy's business did not evaporate completely the day after the price increase was announced shows only that in a real market the restoration of a competitive equilibrium disturbed by a seller's effort to test the conditions of demand is not instantaneous.

▪ The steepness and selectivity of the price discount attest not to the possession of market power by Beckley–Cardy but to the influence of salesmen over purchasing agents in this business. American Academic Suppliers hired salesmen away from Beckley–Cardy in the hope that they would switch the accounts they serviced from their old to their new employer. The hope was largely fulfilled. How was Beckley–Cardy to get the accounts back? It could

and did hire new salesmen, but they were placed at a disadvantage by lacking experience with and the personal trust of the school purchasing agents. Indeed they were at a double disadvantage, because in order to lure accounts from Beckley–Cardy to American Academic Suppliers, the salesmen who had defected to the latter firm could be expected to bad-mouth their former employer. American Academic Suppliers' competitive strategy had reversed the entrant-incumbent role. It became the incumbent seller to the accounts brought over to it by the former employees of Beckley–Cardy. With respect to those accounts Beckley–Cardy became the new entrant, fighting to attract them away from the incumbent. It is commonplace for new entrants to use deep discounts to persuade customers to switch from established firms. These promotional discounts raise no antitrust problems. *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, *supra*, 881 F.2d at 1400; *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2d Cir.1979), though often they are below incremental cost in a superficial sense. (Superficial because they may be above that cost when the promotional value of the discounts is added to the discounted price, as it should be to construct the full price with which to compare incremental cost.)

An element of mystery will always surround Beckley–Cardy's competitive response. But the least plausible inference—too implausible to allow a reasonable jury to bring in a verdict for the plaintiff—is that Beckley–Cardy was trying to obtain a monopoly and would unless interrupted have succeeded with enough probability to warrant judicial intervention. If Beckley–Cardy overreacted, it was to the fact that it was being pressed by a competitor formed by its former president and embarked on a program of luring away its salesmen. Resentment is not an antitrust violation.

The plaintiff's Robinson–Patman claim may at first glance seem more promising than its Sherman Act claim, since the Robinson–Patman Act embodies a philosophy more favorable to the protection of competitors, as distinct from consumers, than the Sherman Act does. Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, forbids a seller to charge different prices to different purchasers of the same commodity if the effect "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition" either with the seller himself ("primary line" discrimination) or with a customer of the seller ("secondary line" discrimination). In *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), the Supreme Court held that a seller who charged different prices for the same good in different areas and did so with the intent of injuring a competitor violated the statute. Since every seller who cuts price in an effort to increase his sales could be said to intend to injure a competitor, the *Utah Pie* decision read literally would make area price discrimination unlawful per se, contrary to the statutory language that refers to competitive effects. The Court did refer to predatory pricing and predatory intent, *id.* at 696–97, 87 S.Ct. at 1332–33, but in context seems to have equated these terms to pricing below average cost with intent to injure a competitor, and this is not much of a limitation on the scope of the decision.

Critique and interpretation of *Utah Pie* have become a cottage industry, whose product we surveyed skeptically in *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, *supra*, 881 F.2d at 1404–06. It is enough here to note that evidence to which the Supreme Court attached great importance—"the evidence shows a drastically declining price structure which the jury could rationally attribute to continued or sporadic price discrimination," 386 U.S. at 703, 87 S.Ct. at 1336— is missing from this case. There is no evidence that during the period in which the price discounts were in effect, either American Academic Suppliers or any other firm reduced its prices. The efforts of the turncoat salesmen were evidently enough to enable American Academic Suppliers to continue growing, in the face of Beckley–Cardy's discounts, without reducing its own prices. The plaintiff in

*Utah Pie* also gained sales, but at the cost of having to reduce its prices in order to meet the defendants' competition. All that American Academic Suppliers lost was a chance to grow even faster than it did. There is *nothing* here that resembles competitive injury, even within the generous terms of *Utah Pie.*

 With respect to the state law claims, we have nothing to add to Judge Hart's analysis except with respect to the claim of disparagement (a common law tort, closely akin to defamation but focused on commercial harm, Prosser and Keeton on the Law of Torts, § 128 (5th ed.1984), and codified in Illinois and Ohio in Ill.Rev. Stat. ch. 121½, ¶¶ 262, 312(8), and Ohio Rev.Code ch. 4165.02(H), respectively) based on the letter quoted earlier in this opinion. Judge Hart overlooked that letter, but the disparagement claim based upon it so borders on the risible that we do not think a remand is necessary—so clear is it that Beckley–Cardy is entitled to summary judgment. The letter warns the customer against the low prices of competitors. What consumer ever thought it disparaging a seller to accuse him of selling at low prices? There is also, it is true, a suggestion that these unnamed sellers are not going to have enough product to fill all the orders of consumers clamoring for discounts, but this sounds like sour grapes and anyway the consumers in question are purchasing agents unlikely to be put off by fear of being subjected to bait-and-switch tactics. Since, moreover, American Academic Suppliers did not make inroads into Beckley–Cardy by offering price discounts—its strategy was to win business through the personal contacts of its, formerly Beckley–Cardy's, salesmen—it is far from clear, despite the reference to the turncoat salesmen, that the recipient of the letter would have considered it a warning against American Academic Suppliers. That might be debated; but so improbable is it that any of the purchasing agents would be swayed by such a letter that to resist summary judgment the plaintiff was obliged to produce some evidence beyond the letter itself, a letter innocuous if not absurd. A jury could not be permitted to infer disparagement and assess damages from the letter alone, and therefore the defendant was entitled to summary judgment on this as well as on its other claims.

Affirmed.